702 A.2d 223

ATTORNEY GRIEVANCE COMMISSION,

v.

Meldon S. HOLLIS, Jr.

Misc. Docket (Subtitle BV) No. 41, Sept. Term, 1995.

Court of Appeals of Maryland.

Nov. 7, 1997.

Melvin Hirshman, Bar Counsel and John C. Broderick, Asst. Bar Counsel, for Attorney Grievance Commission of Maryland.

Charles Jerome Ware, Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW KARWACKI,* RAKER and WILNER, JJ.

PER CURIAM.

The Attorney Grievance Commission, by bar counsel, filed in this Court a petition for disciplinary action against Meldon S. Hollis, Jr., a member of the bar of this Court. Hollis was charged with violating the following Maryland Lawyers' Rules of Professional Conduct: Rule 1.15;[1] Rule 8.1;[2] and Rule

---

* Karwacki, J., now retired, participated in the hearing of this case while an active member of this Court. After being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

1. **"Rule 1.15. Safekeeping Property.**
 (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Subtitle BU of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
 (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

8.4(c) and (d).[3] In addition, he was charged with violating three of the Maryland Rules relating to attorney trust accounts[4] and with violating Maryland Code (1989, 1995 Repl.

> (c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."

2. "**Rule 8.1. Bar Admission and Disciplinary Matters.**
An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
(a) knowingly make a false statement of material fact; or
(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6."

3. "**Rule 8.4. Misconduct.**
It is professional misconduct for a lawyer to:
 * * * * * *
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice;
 * * * * * *"

4. "**Rule BU4. Trust Account—Required Deposits.**
Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.
"**Rule BU8. Interest on Funds in Attorney Trust Accounts.**
Any interest paid on funds deposited in an attorney trust account, after deducting service charges and fees of the financial institution, shall be credited and belong to the client or third person whose funds are on deposit during the period the interest is earned, except to the extent that interest is paid to the Maryland Legal Services Corporation as authorized by law. The attorney or law firm shall have no right or claim to the interest.
"**Rule BU9. Prohibited Transactions.**

Vol.), § 10–306 of the Business Occupations and Professions Article.[5]

Pursuant to Rule 16–707, this Court on January 2, 1996, ordered that the charges against Hollis be transmitted to the Circuit Court for Baltimore City, and we designated Circuit Judge Richard T. Rombro to hear the charges. Our January 2, 1996, order further directed that Hollis respond to the charges within 15 days from the date the charges were served upon him, and that the hearing before Judge Rombro be held not later than 30 days from the filing of Hollis's response. Subsequently this Court, upon the Commission's motion and without any objection from Hollis, entered an order extending the time for a hearing until April 22, 1996.

Prior to the scheduled hearing on April 22, 1996, Hollis filed a "Motion For Recusal of Judge Richard T. Rombro," asserting a "lack of impartiality on the part of Judge Rombro." The alleged "lack of impartiality" appeared to be based upon two specific matters: (1) Judge Rombro's overruling Hollis's attorney's objection to the April 22, 1996, hearing date because it was not convenient for the attorney; (2) the fact that Hollis did not support Judge Rombro's candidacy, as a sitting judge, for election to the circuit court in 1990. This Court, by an order of March 26, 1996, denied the motion for the recusal of Judge Rombro. Thereafter, Hollis filed a "renewed" motion for the recusal of Judge Rombro which this Court denied on April 8, 1996.

---

> An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer."

These rules are now codified as Maryland Rules 16–604, 16–608, and 16–609.

5. Section 10–306 provides:

> **"10–306. Misuse of trust money.**
> A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

The hearing commenced on April 22, 1996. Subsequently, Judge Rombro made the following findings:

"This Attorney Grievance matter was referred to this court by the Court of Appeals on January 2, 1996, in accordance with Rule BV–9 et seq. to conduct a hearing and to report the findings of fact and conclusions of law to the Court of Appeals. The referral followed the filing of a petition for disciplinary action against the Respondent, Meldon S. Hollis, Jr. by the Attorney Grievance Commission of Maryland.

"The Respondent filed a motion asking for recusal of the trial court in the Court of Appeals. This motion was denied. Thereafter, the Respondent filed a second motion requesting the same relief, which was again denied. Following this, hearings were held before this court on April 22nd and April 23rd of 1996. The Respondent appeared with counsel, and at the outset addressed a third motion for recusal to this court. The court declined to rule on Respondent's motion for the reason that it was within the province of the Court of Appeals, which had twice denied the same motion. The court did explain that even if the motion was proper, there was no basis for recusal. After these preliminaries, the court took testimony from Bar Counsel and the Respondent and herewith submits the following report to the Court of Appeals.

## "FINDINGS OF FACT

"The Complainant, Dr. Leroy Amar, testified that he had been represented by the Respondent since sometime in 1987. Dr. Amar had met the Respondent while Respondent was a member of his previous law firm. The doctor testified that the Respondent represented him over a period of years on numerous complex matters.

"Amar testified that in 1990 he had borrowed $150,000.00 from one Ramona Cowan, who was a personal friend. He was to repay the loan with interest at an annual rate of eighteen percent. He testified that he had made payments over a period of years, primarily on the interest and had not been able to repay the principal. In 1991 the lender, M's Cowan,

died in an automobile accident and the loan to Dr. Amar was included as an asset in her estate.

"On January 6, 1992, Dr. Amar sold three of his four medical clinics for approximately one million dollars. The doctor took back a mortgage and the buyer was to pay $200,000.00 at the time of the settlement. Most of the $200,-000.00 was used to pay off debts of the clinic so that the sale could be concluded. After the payment of debts, there were net proceeds of $40,000.00 to be paid to Dr. Amar. As part of Amar's agreement with the buyer, he was also to receive a $50,000.00 loan. At the time of settlement then, based on the proceeds and the loan, Amar was to receive $90,000.00. An additional $3,450.00 was withheld to pay an existing tax lien against the business.

"Amar clearly testified that his instructions to the Respondent were that the $90,000.00 was to be forwarded to the Estate of M's Cowan, to be applied to the balance due her.

"On January 9, 1992, Respondent wrote to the law firm of Siskind, Burch, Grady & Rosen, who represented the purchaser. The letter set forth the understanding of the distribution of funds. The Respondent requested from the Siskind firm a certified check payable to Hollis & Associates, P.A., in the amount of $40,095.49. He also requested the amount of $3,450.00, which had been withheld to satisfy a tax lien, but which was apparently not necessary. On that same date, January 9, 1992, the Siskind firm issued its Check No. 1015 drawn on the First National Bank in the amount of $40,095.49 payable to Hollis & Associates, and forwarded it to the Respondent. The Respondent received that check and deposited it in his account in the First American Bank of Maryland/First Union National Bank on January 10, 1992. The loan to Dr. Amar was advanced by separate check, No. 1016, drawn on the Escrow Account of the Siskind firm on January 10, 1992, and was forwarded to Respondent. That check was also payable to Hollis & Associates, P.A. It was received on January 13, 1992 by the Respondent and deposited into the same account as the earlier check. Finally, Check No. 1017,

again drawn on the Escrow Account of the Siskind firm, in the amount of $3,450.00, which had been withheld for the outstanding tax lien, was forwarded to the Respondent. Check No. 1017 was also payable to Hollis & Associates, P.A., and was received by the Respondent on January 13, 1992, who deposited it into the account referred to above.

"The daughter of Ramona Cowan was employed by Dr. Amar in an office in Washington, D.C. Dr. Amar testified that in a conversation with the daughter he was told that the lawyer for the estate was upset because no monies had been paid to the estate. Dr. Amar thereupon contacted the Respondent and asked why the money had not been paid. The Respondent advised the doctor that he had made the payment.

"Based on Respondent's representations, Dr. Amar told M's Cowan's daughter that, in fact, the money had been paid to the estate. Dr. Amar testified that he had occasion to speak directly to the Executor of the Estate, who informed him again that no money had been paid. Dr. Amar thereupon contacted the Respondent and asked the Respondent to produce cancelled checks or other proof of payment so that he could show it to the Executor. The court believes from Dr. Amar's testimony that the request to the Respondent for the proof of payment was not made in a confrontational manner; that the doctor believed that the Executor was mistaken, and wished to show her the proof of payment. The Respondent, according to Dr. Amar, promised to obtain and present such proof to him. The Respondent did not deny Dr. Amar's testimony in this regard.

"Sometime later, the Respondent finally acknowledged that he had not made any payments on behalf of Dr. Amar to the Estate of M's. Cowan. During the course of those discussions Dr. Amar learned for the first time that the $3,450.00 amount which had been withheld for the tax lien was also in the Respondent's account. The Respondent agreed to send this amount to Dr. Amar with interest, which was done and received by Dr. Amar sometime in August of 1992.

"On May 28, 1993, Dr. Amar filed a complaint against the Respondent with the Attorney Grievance Commission alleging that Respondent had failed to pay the Estate of M's Cowan as he had been instructed to do.

"Thereafter Bar Counsel began an investigation of the matter and throughout the course of counsel's investigation the Respondent gave several conflicting reasons for his actions in connection with the account.

"Bar Counsel's letter of September 14, 1993 (Petitioner's Exhibit No. 9), requested bank records of the Respondent's Escrow Account to ascertain the status of Dr. Amar's funds. On September 21, 1993, the Respondent acknowledged receipt of the request (Petitioner's Exhibit No. 11), and thereafter, on November 2, 1993, refused to provide the requested bank records (Petitioner's Exhibit No. 12). In explaining his reasons for non-compliance with the Petitioner's request, the Respondent made the puzzling statement, 'First, the funds that Dr. Amar alleges are owed to him have in no way been connected with my escrow account since January of 1991 ... It is known by Dr. Amar and his attorney, and not disputed by me, that the funds were removed from the account and invested ... The fact that the funds were moved into an investment account to be held pending resolution of the amount due to our firm, was communicated both to Dr. Amar and his counsel.'

"The Commission immediately responded to the November 2nd letter and on November 4, 1993, (Petitioner's Exhibit 13), again requested specific bank records and directed that the Respondent reply by November 10th. On that date the Respondent did reply and asked for additional time to provide an accurate accounting of the funds held on behalf of Dr. Amar. The Respondent requested until November 15th to reply. In the November 10th letter the Respondent partially complied with some of the Commission's requests. As to one item Respondent replied:

'4. In addition you have requested a complete accounting of funds "held, maintained or invested, including an

accounting of any interest earned on the investment, how the interest was disbursed and to whom". It is my recollection that the subject funds were held in the escrow account for several months. It is also my recollection that several disbursements were made out of the escrow account to Dr. Amar and to other parties including government agencies. After several months, those funds were removed from the escrow account at the instruction of and with the full knowledge of the client.'

Although the response is couched in terms of a 'recollection' rather than simple declarative statement, the court finds that this recounting of events was false. The spreadsheet summary of the Respondent's bank records and the testimony of the Petitioner's investigator clearly showed there were no such payments made either to Dr. Amar or on his behalf from this account.

"The spreadsheet summary of Respondent's account was obtained by Bar Counsel by subpoena. These records were reviewed for the period from December 31, 1991 through February 28, 1994. The records show that the account was closed on June 25, 1992, when there was a remaining balance of $8.15. The records also show that no payments had been made out of that account on behalf of Dr. Amar; rather, the records disclose that between January 10, 1992 and June 25, 1995 the Respondent transferred large sums from the escrow account to his own operating account and made direct payments for professional expenses for the benefit of his law office. They also show a transaction of April 15, 1992 in the amount of $82,781.00 withdrawn from the escrow account. These are the funds that the Respondent said he had invested. Finally, the records show that the escrow account was an interest-bearing account and that $1757.28 in interest had been credited to the account, which was not paid to Dr. Amar.

"The evidence is uncontradicted that by February, 1994, more than two years after the Respondent had received the funds on behalf of his client, no payments had been made to

the Estate of Ramona Cowan or to the Complainant or for any other purpose for the Complainant's benefit.

"The Respondent indicated that the monies withdrawn had been invested in a stock named Pyrocap, which was being held in trust at Tameron Investment Corporation for the benefit of Dr. Amar. The court finds that this statement also was not true.

"In Respondent's letter of March 10, 1992, (Petitioner's Exhibit No. 3) Respondent alleged that there was a fee dispute with Dr. Amar which caused him to withhold funds. The Respondent testified as to the fee dispute in general terms and never identified for the court what amount he claimed was in dispute. This court finds that there was no fee dispute, and that the issue was advanced by the Respondent as an excuse for not having paid the funds to Dr. Amar. In any event, it is clear that the entire amount was not in dispute as a result of a fee controversy; assuming the Respondent would have been able to hold a disputed amount pending resolution, he certainly could not hold the entire $82,781.00.

"Respondent also testified before the Inquiry Panel. At that hearing for the first time Respondent explained that Dr. Amar had loaned the money to him. Although there is no transcript of those proceedings, both Dr. Amar and bar counsel's witness, Mr. Fiedler, testified that Respondent advanced that explanation to the Panel. This court accepts their testimony.

"Regretfully, this court can place little credence in the Respondent's testimony. Prior to the hearing, the Respondent advanced a number of versions of the facts surrounding the withdrawal of the money from his escrow account. Before this court, responding to Bar Counsel's questions, he either equivocated or professed lack of memory of the events. The court notes that the paper trail of the money ends with the closing of the escrow account. Respondent testified that he closed the account by withdrawing $82,781.00 payable to Hollis & Associates to move it to Nations Bank to open another

escrow account. When questioned by the court, the following colloquy occurred:

'THE WITNESS: (Mr. Hollis) That is all that is. Closing at one bank, and opening at another.

'THE COURT: And you gave this information to them earlier?

'THE WITNESS: No, Your Honor.

'THE COURT: Why? They are asking you what happened with money that you—I mean, it is very clear. They are saying that you have taken money that belonged to a client, and you are saying, I moved it to Nations Bank across the street. Why didn't you tell them that?

'THE WITNESS: I really have no answer. I mean, I just have no answer that makes any sense.

And again at a later point in the testimony, the court asked:

'THE COURT: Knowing that all this is going on, and knowing what you were being questioned about, did you make any effort at all to get copies of your account from Nations Bank, your escrow accounts?

'A. No, I didn't, Your Honor.

'THE COURT: Did you think that was important?

'THE WITNESS: It did not occur to me.'

## "THE JEFFREY BILLUPS MATTER:

"Paragraph 17 of Bar Counsel's petition avers that the financial record of the escrow account indicates that Jeffrey Billups' funds were 'misappropriated by Respondent.'

"The testimony with regard to this claim showed that Respondent had handled a claim against CMX Corporation for five clients; McNeill, Scott, Wesley, Rogers and W. McNeill. The case was settled for a total of $37,243.81, which was deposited in the escrow account on July 22, 1991. After the settlement money had been disbursed to the clients and for fees, a check was issued to Jeffrey Billups in the amount of $1734.41 on February 18, 1992. A second check in the same amount was issued to Billups on February 25, 1992, marked

'settlement-final-CMX.' It is Bar Counsel's position that since all of the funds had already been paid out, the payments to Billups must have come from other clients' money when it was written from the escrow account. Respondent's testimony was that he lost money on the CMX matter since he had to pay Billups from his fees. Billups' participation in the CMX matter is problematic. Respondent stated that Billups was not one of the people who was bringing a claim against CMX. This court was at a loss to understand why Respondent would have paid Billups anything since he had no claim against CMX and since the funds had already been distributed. The court finally asked the Respondent whether Billups had brought the other cases in, to which the Respondent replied, 'He was very much a part of the group that came in with those guys, and was at most of the meetings that I attended; he was there providing documents and so forth.'

"This court can speculate as to the reason for the payments to Billups, and as to whether the payment invaded other clients' trust funds in the escrow, but it cannot make such finding by clear and convincing evidence. Rule BV–10(d).

### *"CONCLUSIONS OF LAW*

"Based on the foregoing findings of fact in connection with the handling of Dr. Amar's funds, the court finds that the Respondent violated Rule 1.15 Safekeeping Property; Rule 8.1 Bar Admission and Disciplinary Matters in that Respondent knowingly made false statements of material fact; Rule 8.4 Misconduct; Rule BU–4 Trust Accounts; Rule BU–8 Interest on Funds in Attorney Trust Accounts; Rule BU–9 Prohibited Transactions and Rule 10–306 Misuse of Trust Monies."

The Commission filed no exceptions to Judge Rombro's findings and conclusions.

Hollis excepts to Judge Rombro's failure to recuse himself. In addition, Hollis asserts that Judge Rombro failed to consider "properly" certain matters. Finally, Hollis makes the bald assertions that Judge Rombro clearly erred in finding various violations of the rules and that there was no clear and

convincing evidence that Hollis violated any of the rules which were found to be violated. Hollis's exceptions contain no reasoning or analysis of the evidence.

 Judge Rombro correctly held that, in this type of proceeding, the matter of his recusal was within the province of the Court of Appeals. This Court twice previously denied Hollis's contention that Judge Rombro should be recused. The scheduling of the hearing on a date which was assertedly not convenient for Hollis's attorney clearly did not furnish a ground for recusal of Judge Rombro.

Likewise, the fact that Hollis did not support Judge Rombro in an election several years before is no ground for Judge Rombro's recusal. The Wisconsin Court of Appeals recently rejected a similar contention, explaining as follows (*State v. McBride,* 187 Wis.2d 409, 417–418, 523 N.W.2d 106, 110–111 (1994)):

> "McBride next contends that Judge Koehn was biased against her because she supported his opponent in the election.... As to McBride's support of Judge Koehn's opponent, we note that in states using elections for their judicial selection process the bar will frequently be divided among the various contenders for the judicial position. If those who support the losing candidate are allowed to claim actual bias, a judge would be unnecessarily precluded from hearing a significant number of cases arising within his or her jurisdiction. Furthermore, judges have an ethical obligation to treat attorneys impartially.... This court is unwilling to conclude that Judge Koehn violated this ethical obligation solely because McBride did not support his candidacy. Therefore, we conclude that McBride's support of Judge Koehn's opponent, standing alone, is not sufficient evidence to allow this court to conclude that Judge Koehn harbored actual bias against her."

*See also, e.g., Ex parte Grayson,* 665 So.2d 986, 987 (Ala.Crim. App.1995) ("A lawyer who becomes a candidate for the public office of judge accepts the risk that, if he loses, he may have to try cases in the court of his successful opponent"); *Paul v.*

*Nichols,* 627 So.2d 122, 123 (Fla.App.1993) ("there is a presumption that a judge will be impartial even when a lawyer has voiced opposition to the election of a judge"); *Raybon v. Burnette,* 135 So.2d 228, 230 (Fla.App.1961); *Pierce v. Charity Hospital of Louisiana,* 550 So.2d 211, 214 (La.App.1989) ("A judge is often in the position of handling matters which involve an attorney who has campaigned or contributed to the judge's opponent.... [This does] ... not establish any bias or prejudice by [the] Judge"); *Valladares v. Second Judicial District Court,* 112 Nev. 79, 910 P.2d 256 (1996).

■ With regard to Hollis's other exceptions, our review of the record discloses that Judge Rombro's findings were supported by clear and convincing evidence and are not clearly erroneous. "It is well settled that, in disciplinary proceedings, the factual findings of the hearing judge will not be disturbed unless they are clearly erroneous." *Attorney Griev. Comm. v. Awuah,* 346 Md. 420, 434, 697 A.2d 446, 453 (1997). Consequently, Hollis's exceptions are overruled.

■ The hearing judge found that Hollis had misappropriated his client's funds and had repeatedly made misrepresentations when questioned about the money which he was supposed to pay to the estate of Ramona Cowan. The findings show that Hollis acted knowingly and intentionally. No compelling extenuating circumstances were found to exist. Therefore, the appropriate sanction is disbarment. *Attorney Griev. Comm'n v. Williams,* 335 Md. 458, 474, 644 A.2d 490, 497–498 (1994); *Attorney Griev. Comm'n v. Kolodner,* 321 Md. 545, 546, 547, 583 A.2d 724, 725 (1991); *Attorney Griev. Comm'n v. Lazerow,* 320 Md. 507, 513, 578 A.2d 779, 782 (1990); *Attorney Griev. Comm'n v. Ezrin,* 312 Md. 603, 608–609, 541 A.2d 966, 969 (1988); *Attorney Griev. Com'n v. Trilling,* 311 Md. 711, 716, 537 A.2d 269, 271 (1988).

Accordingly, we direct that Meldon S. Hollis, Jr., be forthwith disbarred from the practice of law in this State, and that his name be stricken from the rolls of those authorized to practice law in this State.

*IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS, AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST MELDON S. HOLLIS, JR.*