765 A.2d 653

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Mark M. TOMAINO.**

**Misc. Docket AG No. 7, Sept. Term, 1999.**

Court of Appeals of Maryland.

Jan. 17, 2001.

Melvin Hirshman, Bar Counsel and John C. Broderick, Asst. Bar Counsel for the Atty. Grievance Com'n of MD, for petitioner.

Gerard P. Martin, Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY *, RAKER, WILNER, CATHELL and HARRELL, JJ.

RODOWSKY, Judge.

The respondent, Mark M. Tomaino (Tomaino), has been found to have violated Rule 8.4(c) of the Maryland Rules of Professional Conduct (MRPC) by engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation." He has also been found to have violated a medley of rules and statutes concerned with protecting trust funds. Specifically these are MRPC 1.15, dealing with the safekeeping of clients' property, and Maryland Code (1989, 2000 Repl.Vol.), § 10–306 of the Business Occupations and Professions Article (BOP) ("A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."). MRPC 1.15 incorporates the requirements for maintaining trust accounts and the prohibitions against commingling found in Chapter 600, "Attorney Trust Accounts," of Title 16 of the Maryland Rules of Procedure. Further, Tomaino

---

* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

has been found to have engaged in a conflict of interests which resulted in very substantial liability against the law firm which employed Tomaino as an associate attorney. There are no exceptions of any consequence. We shall disbar.

With approximately five years of experience as an associate in the corporate departments of two other large Baltimore law firms, Tomaino was hired as a lateral with portables by Weinberg & Green (W & G) in August 1990. His arrangement was a salary plus fifteen percent of the fees collected for services by W & G for clients produced by Tomaino. He left W & G in late 1991 to work in the legal department of Bausch & Lomb in Rochester, New York. The professional carnage that Tomaino left behind in Baltimore began to be uncovered when W & G was sued in 1993 as an outgrowth of the transaction involving the conflict of interests violation (hereinafter, the GeneSys transaction). W & G's preparation of discovery responses in that litigation revealed, or lead to the revelation of, improprieties in Tomaino's handling of funds in four other transactions unrelated to GeneSys.

The GeneSys litigation involved at least four proceedings in the Circuit Court for Baltimore County, namely, a temporary restraining order hearing before Judge Thomas A. Bollinger, an interlocutory injunction hearing before Judge Dana M. Levitz, a trial on certain issues before Judge Joseph F. Murphy, Jr., and a jury trial in a protracted case before Judge Lawrence R. Daniels that concluded about December 1996. Although Bar Counsel had been aware of this litigation, Bar Counsel understandably did not undertake a full investigation until those proceedings had concluded.

When Bar Counsel completed his investigation, Tomaino waived hearing before an Inquiry Panel. We referred the petition for disciplinary action to Judge Edward J. Angeletti of the Circuit Court for Baltimore City for hearing and findings of fact. The only witnesses at this hearing were the managing partner of W & G, an investigator for Bar Counsel, and respondent. Judge Angeletti found violations in five transactions which we shall call IRM–Insurance Funds, IRM–

Signet Funds, Harrogate, GeneSys, and National Head & Neck.

Tomaino admitted most of the material facts at the hearing before Judge Angeletti. In this Court Tomaino acknowledged that "the facts that make up this conduct by and large have not been questioned below." In our description of the transactions, set forth below, we have attempted to give effect to many of Tomaino's exceptions. These, however, relate to matters of detail and do not challenge matters of substance.[1] Tomaino acknowledges that the basic facts in the GeneSys transaction support the finding of a MRPC 8.4(c) violation. With respect to the other four transactions, Judge Angeletti found that "[t]hese other acts of misconduct constitute misappropriation of funds and misuse of trust money entrusted to [Tomaino]." Judge Angeletti further said that "[t]hese violations were knowing and willful on the part of [Tomaino] and further deceitful in his not disclosing receipt of these funds to the appropriate parties . . . ."

Tomaino's review of the transactions, in connection with his discussion of an appropriate sanction, presents as facts his characterization of the transactions. We shall treat Tomaino's version of the facts as presenting exceptions. Our presentation of Tomaino's position with respect to sanctions is deferred to the section of this opinion so headed.

### IRM–Insurance Funds

One of the clients that Tomaino brought to W & G was Institute of Resource Management, Inc. (IRM). IRM was a beneficiary of a life insurance policy on one of its employees. When that employee died in October 1990 there were competing claims to the proceeds. IRM received $100,000 of the proceeds which Tomaino placed in his personal account at Legg Mason, a stock brokerage and mutual funds firm. To-

---

1. Judge Angeletti found that Tomaino "was less than candid in testimony before Judge Levitz in 1991 and Judge Daniels in 1996." The parties agree that this finding should be limited to the testimony before Judge Levitz.

maino testified that he did this at the instruction of the then owner of IRM, Jerry W. Donahoe (Donahoe), who said he did not want the money tied up in the W & G trust account because he intended to wire the money. The money was wired in two $50,000 transmissions to a law firm in New Orleans which later transferred $50,000 back to Tomaino's personal account. Tomaino testified that the $50,000 transferred to his personal account was supposed to have been directed to W & G. Nevertheless Tomaino transferred only $40,000 to W & G and retained $10,000 for himself. He testified that Donahoe told him to keep the $10,000 out of appreciation for Tomaino's having been with Donahoe " 'through thick and thin.' " Tomaino admitted that he made a "very, very significant, to put it mildly, mistake."

In addition to his general finding of misappropriation, Judge Angeletti specifically stated that this conduct "constituted a misappropriation of funds which [Tomaino], impliedly, held as a fiduciary to his employer," W & G. In his exceptions Tomaino admits that "retention of the $10,000 was improper," but he argues that, "rather than a misappropriation from [W & G] who was paid in full, the funds should have gone to the client." Somewhat contradictorily, in his presentation of the facts, Tomaino submits that his testimony that the client consented is unrebutted and implicitly argues that there was no misappropriation.

Clearly, Tomaino violated the trust account requirements. The funds were not his. The funds were held for Donahoe, and it is immaterial whether they were a retainer for future professional services by W & G or were to be applied by Donahoe for some other legitimate purpose. In either event, the funds should have been placed in the W & G Clients' Fund Account or returned to the client. When Tomaino placed the funds in his personal account, he ran the risk that the trier of fact would reject his testimony concerning client consent. Judge Angeletti's finding that there was a knowing, willful, and deceitful misappropriation of funds is a rejection of Tomaino's attempted justification.

At the conclusion of his report to us, Judge Angeletti states that "the Donahoe and Wortley gifts, all constitute violation of" BOP § 10–306. We read this reference to "gifts" as utilizing Tomaino's characterization to identify the funds, and not as a finding of fact. This is clear from the reference to BOP § 10–306 by which Judge Angeletti concludes that, contrary to that prohibition, Tomaino did "use trust money for [a] purpose other than the purpose for which the trust money [was] entrusted to the lawyer."

### IRM–Signet Funds

IRM became hard pressed for cash while owned by Donahoe, largely because it was in default on a secured loan to MNC Credit Corp. Donahoe was willing to make an assignment in lieu of foreclosure if he could arrange for a sale of IRM by MNC Credit Corp. to a buyer under terms that would protect Donahoe from personal liability. He turned to Joseph C. Wortley, Jr. (Wortley) of Liberty Corner, New Jersey. In connection with Wortley's effort to buy IRM, an escrow account, held by Tomaino and a partner at Piper & Marbury, was established at a financial institution. W & G's Ethics and Conflicts Committee approved having the escrow held outside of the W & G Clients' Fund Account because another law firm was also serving as escrow agent. Wortley was ultimately able to purchase IRM from MNC Credit Corp. under circumstances whereby $100,000 from the joint agents' escrow fund was released. The entity in which Wortley took the assets of IRM was Liberty Engineering, Inc., a corporation formed for Wortley by Tomaino. The $100,000 from the escrow fund thereby became an asset of Liberty Engineering. In late November 1990 these funds were wired to W & G which disbursed $25,000 each to Donahoe and Wortley. The balance of $50,000 was transferred by W & G to a new escrow account at Signet Bank. That account was titled, "Marc M. Tomaino, IRM Escrow Account." In February 1991 Tomaino closed the account at Signet and transferred the funds, then totaling $50,641.18 to his personal account at Legg Mason. In March Tomaino caused $35,641.18 to be disbursed from that account

on the check of Legg Mason to W & G where it was credited in the Clients' Fund Account as a retainer from Liberty Engineering. Of the $15,000 balance, $5,000 was disbursed by Legg Mason in June 1991 for purposes that do not appear in the record. The remaining $10,000 was disbursed by Legg Mason in December 1991, after Tomaino had moved to Rochester, where it apparently was deposited in Tomaino's account at Chase Bank in Rochester.

Tomaino testified that Wortley told him not to put the $50,000 into the W & G trust account and told him that he could give the $15,000 balance of that $50,000 to his mother-in-law as far as Wortley was concerned. In his exceptions Tomaino points out that Wortley made no claim to the funds when notified of their existence by Tomaino's present counsel.

This is one of the group of transactions in which Judge Angeletti found a misappropriation by Tomaino. As explained in the IRM–Insurance Funds transaction, Judge Angeletti's finding of violation of MRPC 1.15 and of BOP § 10–306 is supported by the record.

### Harrogate

IRM owned computer equipment, the purchase of which had been financed by Harrogate Corporation (Harrogate). IRM leased the equipment back to Harrogate which, in turn, subleased the equipment to the Ministry of Defense of the Netherlands. When IRM fell on hard times, it agreed that Harrogate should resell the equipment. The latter did so, producing net proceeds on the resale of $58,405. In April 1991 Tomaino deposited these funds in an investment account at PaineWebber in his own name and under his own social security number. The funds remained in that account after Tomaino moved to Rochester. By January 1992 the account had grown to $60,600. In that month Tomaino withdrew accumulated earnings of $2,257.38. In March 1992 he withdrew $8,780.12, leaving a balance of $50,165.29, well below the original $58,405. Thereafter, and no later than January 1993, he transferred the funds, then $51,807.58, to another account held in his own name at Merrill Lynch where it was invested

in stocks. The funds remained in Tomaino's account until April 1995 when they totaled $65,494 and were delivered to Tomaino's present attorney who gave notice to potential claimants. Harrogate and MNC Credit Corp. claimed the funds based on respective security interests in the equipment. The funds were ultimately divided seventy-two percent to Harrogate and twenty-eight percent to MNC Credit Corp.

Tomaino testified that the principal of Harrogate, James Carrier (Carrier), asked Tomaino to hold the funds in Tomaino's name. Carrier was said to be concerned over the effect of a European insolvency on Harrogate's claim. Tomaino denied that he assisted Carrier in hiding assets from creditors. Tomaino said that Carrier knew that the funds were invested in stocks and that Carrier had never made a demand for the money from April 1991 when the account was initially opened until April 1995 when the account was closed.

Judge Angeletti found Tomaino had violated MRPC 1.15 and BOP § 10–306 by the misappropriation of trust money of Harrogate, and Judge Angeletti specifically found that Tomaino had "kept the interest." For the reasons stated as to the IRM–Insurance Funds transaction, these findings are supported by the record.

### GeneSys

Wortley, the purchaser of IRM, came to play a prominent role in the conflicts violation involved in the GeneSys transaction. Essentially the conflict was generated by a bearer stock option, the background for which is somewhat complex.

John J. Meindl, Jr. (Meindl), a client of Tomaino, had owned approximately ninety-five percent of the outstanding capital stock of GeneSys Data Technologies, Inc. (GeneSys), a Maryland corporation. In November 1988 Meindl sold this stock to Vest, Inc., a Delaware corporation, that was part of a Swiss conglomerate, Omni Finance (Omni). Meindl took a security interest in the stock that he had sold, in order to secure the performance of certain promises made by Vest. After the sale Meindl continued as chief executive officer of GeneSys. Dur-

ing the period of Vest's ownership of GeneSys, the latter acquired the stock of B & B Record Center, Inc. (B & B), one of the owners of which was Charles J. Bauer, Jr. (Bauer). He became the chief operating officer of GeneSys. Payment of part of the purchase price due from Vest for Bauer's stock in B & B had been deferred, and Bauer held a security interest in the B & B stock to secure that promise to pay. Also during this period Marc Mathys (Mathys) became chief financial officer of GeneSys. Mathys was an attorney who had been employed in the Omni conglomerate and who knew some of the officers of Omni in Switzerland.

By the fall of 1990 Meindl wanted to reacquire "his" company and had formed the intent, known to Tomaino, to bring Bauer and Mathys into the ownership of GeneSys if Meindl were successful in reacquiring it. Meindl took the position that Vest owed him $730,500 in "deferred purchase price," under a formula in the GeneSys incentive bonus plan. Vest took the position that it owed nothing because GeneSys had no profits.

Tomaino then conceived, or participated in conceiving, a strategy under which Meindl would foreclose on the GeneSys stock and sell the stock at private sale to Wortley, thereby hoping to establish the credit to vest on Meindl's claim against Vest. Wortley would then give Meindl an option to reacquire the stock.

Tomaino anticipated objection from Vest on the ground that the private sale to Wortley did not satisfy the requirement of § 9-504 of the Uniform Commercial Code that the sale be commercially reasonable. In an attempt to meet that objection Tomaino provided as the purchase price the book value of GeneSys, payable by the assumption by Wortley of the obligations of Vest to Meindl and to Bauer. To the extent that the book value of GeneSys exceeded the obligations of Vest to Meindl and Bauer, Wortley would cause GeneSys to issue preferred stock which Meindl would hold as trustee for Vest.

Meindl's right to repurchase the stock of GeneSys from Wortley was to be evidenced by a bearer stock option agree-

ment at an option price of $100,000. A bearer form of option was elected in order to conceal from Omni/Vest that Meindl was the optionee, inasmuch as Meindl hoped to negotiate the acceptance by those parties of the preferred stock proposal and thereby avoid any challenge to the private sale. If Meindl's negotiations with Vest were successful, Meindl would exercise the option and Wortley would be paid $100,000.

Vest attempted to block the foreclosure by a temporary restraining order which was granted on March 21, 1991, by Judge Bollinger on condition that Vest post a $100,000 bond. It was unable to do so, itself having fallen on hard times financially.[2] Meindl proceeded to foreclose and, on March 23, 1991, Wortley, as nominee for Thornbush Investment Limited (Thornbush), purchased at a private sale pursuant to a "Foreclosure Sale Agreement" prepared by Tomaino. On April 1, 1991, Thornbush executed the Bearer Stock Option Agreement prepared by Tomaino.

From April through July 1991 Tomaino spent almost all of his working hours on GeneSys matters. Unknown to him, but generally consistent with Tomaino's knowledge of the plan for GeneSys, Meindl, Bauer, and Mathys on May 21, 1991, had signed an agreement pooling all of their interests in GeneSys, B & B, and certain other corporations. Tomaino now acknowledges that Mathys, individually, became his client during this period. In June 1991 there was a falling out between Meindl, Mathys, and Wortley which left Meindl and Wortley aligned against Mathys, with both interests seeking control of GeneSys. Tomaino recognizes that, at that time, he should have withdrawn from representation of any of the parties, but he sided with Meindl.

Events began to unfold rapidly, but not necessarily in the order in which we present them. Mathys, using his contacts in Switzerland and for a nominal consideration, had acquired the assets of the Dutch corporation which was the immediate

---

**2.** Tomaino testified that the principal of Omni in Switzerland had absconded with many millions of dollars of funds of the conglomerate.

parent of Vest, and Mathys had placed those assets in a corporation chartered by him in the Cayman Islands. Thus, if the foreclosure sale of the GeneSys stock could be set aside, Mathys would indirectly own GeneSys through his indirect ownership of Vest. Tomaino also testified, on information received from Meindl, that Mathys had obtained the bearer stock option from Meindl's possession and without Meindl's consent. Wortley and Meindl agreed that they no longer wanted Mathys in GeneSys.

Tomaino, to convince Mathys that the bearer option was valueless, conceived a ploy whereby Thornbush sent Meindl a letter terminating the option agreement. Mathys, however, was unimpressed when Meindl showed him the letter of purported termination. Mathys told Meindl to have Tomaino respond. Caught in his own web, Tomaino, on behalf of Meindl, then wrote to Thornbush denying that Thornbush was legally entitled to do that which he knew Thornbush did not intend to do. Tomaino argued in this reply that the stock options were part of the consideration for the Foreclosure Sale Agreement. At the same time, Tomaino prepared a letter for Thornbush to copy on its stationery in which Thornbush countered by saying that the consideration was limited to that stated in the Foreclosure Sale Agreement, so that there was no consideration for the bearer option. It is not disputed that all of this was done for the purpose of deceiving, at least, Mathys.

On July 24 Wortley, through Thornbush, called a special meeting of stockholders of GeneSys at which all then serving directors, other than Meindl, were removed, and Wortley and one of his colleagues at Thornbush were elected as the other directors. The new directors also removed Mathys as chief financial officer of GeneSys.

Mathys responded by suing Wortley, Thornbush, GeneSys, and Meindl in an action in which Judge Levitz issued a preliminary injunction. Among other things, the injunction suspended the effect of the directors and shareholders meetings of July 24, designated Mathys a member of the board of

GeneSys, ordered the GeneSys stock placed in escrow with the circuit court, and froze any disposition of GeneSys assets, other than in the ordinary course of business.

Tomaino testified at the hearing before Judge Levitz on behalf of the defendants. Wortley's position in that hearing was that the bearer option had been validly terminated. Tomaino acknowledged before Judge Angeletti that "I gave testimony to that effect," *i.e.*, that the option had been validly terminated. At that hearing exhibits were introduced including the correspondence that constituted the charade intended to deceive Mathys. Tomaino acknowledged before Judge Angeletti that he did nothing to disabuse Judge Levitz of the impression that the letters were genuine communications, intended to convey what the words said. Tomaino's justification for his silence was that he was never directly asked if the correspondence was intended to effect a termination.

Tomaino also acknowledged before Judge Angeletti that, when testifying before Judge Levitz, he had denied "drafting" the bearer option, but that, before Judge Daniels, he had acknowledged that he "was responsible for it." The following exchange then took place between Judge Angeletti and Tomaino.

"[TOMAINO]: And I believe in front of Judge Daniels, I explained the fact that much to my embarrassment and very much consistent with who I was in 1991 versus who I was in 1996 is that I was attempting to be cute. Did I draft it? Did I word process it. Was this drafted. It was in—it was not concise and accurate and it was attempting to play the what [does 'is'] mean game and that was unfortunate.

. . . .

"THE COURT: A deliberate falsehood under oath?

"[TOMAINO]: It wasn't intended to be a falsehood.

"THE COURT: It was a deliberate falsehood under oath, wasn't it, Mr. Tomaino?

"[TOMAINO]: No, Your Honor, it was not intended.

"THE COURT: Well, then what would you characterize being cute under oath meaning?

"[TOMAINO]: It meant—

"THE COURT: When you didn't tell the truth, sir?

"[TOMAINO]: The word drafting, I didn't conceive of the Bearer Option. I just word processed it. It was conceived initially by Marc Mathys.

"THE COURT: So you want the Court to find that you have changed, even though you're still making excuses for what you're saying?

"[TOMAINO]: I'm not making any excuses. I admitted that was wrong. The only thing I didn't admit to was what called for a conclusion as to whether it was perjurious or not and it wasn't false.

"THE COURT: I didn't mention that word. I simply asked you—

"[TOMAINO]: It was a falsehood yes, Your Honor.

"THE COURT: And it was a falsehood under oath, wasn't it?

"[TOMAINO]: Yes, it was.

"THE COURT: Which means it's a lie under oath?

"[TOMAINO]: At the time I didn't appreciate it as a lie under oath.

"THE COURT: Just like you didn't appreciate putting this money in all of your personal accounts when you were given it, is that what you're telling me?

"[TOMAINO]: The same character flaw that led to that led to the other things, yes."

Tomaino acknowledges that this record of the GeneSys transaction supports the MRPC 1.15 and 8.4(c) violations.

The sequel to the GeneSys story is only sketchily presented in the record before us. In June 1992 Judge Joseph Murphy entered a judgment rescinding the foreclosure transaction, Foreclosure Sale Agreement, and the Bearer Stock Option Agreement. He found that Vest was in default as of March 15, 1991, on its stock purchase agreement with Meindl, and Judge Murphy restored Meindl to any rights that he had as of that date to the GeneSys stock as a secured creditor. That

judgment also determined that the Combination Agreement between Meindl, Mathys, and Bauer was valid and enforceable and that any damage claims be resolved at a jury trial.

The jury trial was held before Judge Daniels in 1996 and resulted in a verdict in favor of GeneSys against W & G and Tomaino of $24 million as damages for the loss of the fair market value of GeneSys. On a variety of theories, including a finding on clear and convincing evidence of fraud by Tomaino and a finding of negligent supervision by W & G, Meindl was awarded $400,500, GeneSys an additional $343,950, Mathys $160,000, and Vest $90,600. We were advised at oral argument that, at that point, the litigation was settled.

### National Head & Neck

National Head & Neck (NHN), a partnership, was another of Tomaino's clients. His friend, Dennis Buchman (Buchman), was one of the partners. A dispute arose between the partners which was ultimately settled in early 1991. Part of the settlement agreement was that Buchman would pay up to $10,000 of outstanding legal bills from W & G for services rendered to NHN in connection with the dispute. In February Buchman issued his check for $5,000 payable to the order of "Mark Tomaino, Esq. (for Nat'l Head, Neck & Lowell Weiner, DDS)." Tomaino endorsed this check over to Legg Mason for credit to his personal account. In March Buchman issued a second check in the amount of $5,000 payable to the order of "Mark Tomaino, Esq. (National Head/Neck)." Tomaino either cashed this check or deposited it to his personal account. Judge Angeletti found that there were no outstanding bills from W & G to NHN.

Tomaino testified that he intended to determine the fees owed by NHN to W & G at the end of March and that he failed to do so, characterizing his failure as gross negligence. Judge Angeletti's finding of violation of BOP § 10–306 is supported, for the same reasons previously assigned.

The NHN transaction is distinguishable from the other violations in one respect. W & G did not discover this

violation as part of its investigation prompted by the GeneSys suit. Tomaino disclosed it in connection with his responses to the investigation.

## Conclusion

Tomaino excepts to Judge Angeletti's conclusion in his report to us in which he views the violations collectively, and not individually. Judge Angeletti said:

"[Tomaino] engaged in deceitful conduct in those letters calculated to mislead Mathys and deprive him of the bearer stock option. He was less than candid in testimony before Judge Levitz in 1991. . . . He has demonstrated an alarming propensity for deceit and dishonesty that infests a large part of his dealings spanning a short period of time in 1991 and into 1996. He never disclosed his financial misdealings until discovered by opposing counsel. Only then was [W & G] able to investigate and discover the full extent of [Tomaino's] misdeeds. It is this pervasive dishonesty which inevitably leads this Court to conclude [Tomaino] has violated Rules 8.4(b) and (c) as charged."

We have set forth the record in some detail above. It fully supports Judge Angeletti's conclusion of ultimate fact.

## Sanction

Tomaino's principal argument in mitigation of his misconduct is that he is now a different person, in the psychological or personality sense, from the young attorney who committed the above-described violations. Today he sees that young attorney of 1990–91 as having been driven by an excessive ambition to succeed in private practice. Tomaino points to his present environment as "in house" counsel in the legal department of a major corporation where he has earned the respect of his professional peers. In addition, he has taken and passed the bar examinations in New York and California where he disclosed the pending disciplinary proceedings in Maryland. His hope for admission to the bars of those states will be affected by the sanction in the instant matter. Further, Tomaino notes that the initial notice letter from Bar

Counsel was dated in October 1992. While disclaiming that laches is a defense in a bar disciplinary proceeding, he urges that it be given great weight as a mitigating factor because of his having maintained professional standards since his departure from W & G.

This Court has said on numerous occasions, and recently in *Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 741 A.2d 1143 (1999), that " '[m]isappropriation of funds by an attorney is an act infested with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction.' " *Id.* at 27, 741 A.2d at 1157 (quoting *Attorney Grievance Comm'n v. White*, 328 Md. 412, 417, 614 A.2d 955, 958 (1992)). *See also Attorney Grievance Comm'n v. Sabghir*, 350 Md. 67, 84, 710 A.2d 926, 934 (1998); *Attorney Grievance Comm'n v. Hollis*, 347 Md. 547, 560, 702 A.2d 223, 230 (1997); *Attorney Grievance Comm'n v. Kenney*, 339 Md. 578, 587, 664 A.2d 854, 858 (1995); *Attorney Grievance Comm'n v. Williams*, 335 Md. 458, 474, 644 A.2d 490, 497 (1994); *Attorney Grievance Comm'n v. Bakas*, 323 Md. 395, 403, 593 A.2d 1087, 1091 (1991); *Attorney Grievance Comm'n v. Ezrin*, 312 Md. 603, 608–09, 541 A.2d 966, 969 (1988).

In *Sheridan, supra*, the attorney who had misappropriated client funds was indefinitely suspended with the right to apply for reinstatement no earlier than one year thereafter. This was because the state of mind of the attorney at the time of the violation "[was] important in the context of mitigation." 357 Md. at 29, 741 A.2d at 1158. In that case the circuit judge, acting as a master for this Court, found as a fact that Sheridan's actions were not intentionally fraudulent, an assessment that we were "constrained to accept." *Id.* In the instant matter Judge Angeletti has found that Tomaino's violations were knowing, willful, and deceitful and evidenced "pervasive dishonesty."

In the NHN transaction involved in this proceeding Tomaino does not even contend that the client in any way consented

to Tomaino's taking the client's $10,000. In *Williams,* 335 Md. 458, 644 A.2d 490, we said:

"Although mindful that Respondent has been adjudged guilty of incompetence, neglect, misrepresentation, failure to communicate with his client and commingling of funds, we emphasize the sanction that will be imposed for the misappropriation of client funds, as this is the most egregious of his violations."

*Id.* at 474, 644 A.2d at 497. We disbarred Williams. His attorney's escrow account, by some unspecified amount, had dipped below a required balance of $4,996.40. *Id.* at 470, 644 A.2d at 495.

In *Attorney Grievance Comm'n v. Harper,* 300 Md. 193, 477 A.2d 756 (1984), the attorney misappropriated $2,815.50 from escrow. Although there were other violations, we concurred in Bar Counsel's recommendation of disbarment "in view of the misappropriation of funds from the firm's escrow account." *Id.* at 199, 477 A.2d at 758. This was because, "[t]he Respondent has failed to set forth any mitigating or extenuating circumstances and where, as here, the misconduct involves misappropriation of funds disbarment follows as a matter of course." *Id.* None of the mitigating factors urged by Tomaino constitutes an extenuating mitigating circumstance at the time of the violation.

There have been cases in which this Court has "given a less severe sanction to attorneys found guilty of commingling or misappropriating client funds where there has been a finding that alcoholism was the cause of the attorney's misconduct." *Kenney,* 339 Md. at 589, 664 A.2d at 859 (citing, *inter alia, Attorney Grievance Comm'n v. Miller,* 301 Md. 592, 483 A.2d 1281 (1984); *Attorney Grievance Comm'n v. Willemain,* 297 Md. 386, 466 A.2d 1271 (1983)). Although we followed precedent and ordered an indefinite suspension of Kenney, we issued the following

"caution [to] members of the bar that in the future, we believe that, absent truly compelling circumstances, alcoholism should not provide mitigation where an attorney has

been found to have committed a violation which would ordinarily warrant disbarment."

*Kenney,* 339 Md. at 591, 664 A.2d at 860. Unlike alcoholism at the time of the violations, none of the mitigating factors urged by Tomaino was a cause of the misconduct. Tomaino's argument based on reformation of his character is more appropriate for consideration on an application for reinstatement some time in the future.

For the above-stated reasons Mark M. Tomaino will be disbarred.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST MARK M. TOMAINO.*