979 A.2d 120

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Jonathan H. SHOUP.**

**Misc. Docket AG No. 43 Sept.Term, 2006.**

Court of Appeals of Maryland.

Aug. 28, 2009.

---

464

466

Delores O. Ridgell, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Attorney Grievance Com'n of Maryland), for Petitioner.

Andrew J. Graham of Kramon & Graham, P.A., Baltimore, MD, for Respondent.

ARGUED BEFORE BELL, C.J., RAKER*, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (Retired, Specially Assigned) and DALE R. CATHELL, (Retired, Specially Assigned), JJ.

BELL, Chief Judge.

The Attorney Grievance Commission of Maryland ("the petitioner"), acting through Bar Counsel and pursuant to Maryland Rule 16–751(a),[1] filed a Petition for Disciplinary or Remedial Action against Jonathan H. Shoup, ("the respondent"). Bar Counsel alleged that the respondent violated the following Maryland Lawyers' Rules of Professional Conduct ("MRPC")[2]: 1.1 (Competence),[3] 1.4(a) and (b) (Communica-

---

\* Raker, J., now retired, participated in the hearing and conference of these cases while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

1. Maryland Rule 16–751(a) provides:

 "(a) **Commencement of disciplinary or remedial action.** (1) Upon approval of Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

2. The Maryland Lawyers' Rules of Professional Conduct quoted throughout this opinion correspond to the versions of the Rules that were in effect at the time'of the alleged misconduct.

3. MRPC 1.1 provides:

tion),[1] 1.7(b) (Conflict of Interest: General Rule),[5] 1.8(a) (Conflict of Interest: Prohibited Transactions),[6] 1.15(a), (b) and (c)

---

"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

**4.** MRPC 1.4(a) and (b) provide:
"(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;
(2) keep the client reasonably informed about the status of the matter;
(3) promptly comply with reasonable requests for information; and
(4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.
"(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

**5.** MRPC 1.7 provides:
"(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:
(1) the representation of one client will be directly adverse to another client; or
(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
(b) Notwithstanding the existence of a conflict of interest under paragraph (a), a lawyer may represent a client if:
(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
(2) the representation is not prohibited by law;
(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
(4) each affected client gives informed consent, confirmed in writing."

**6.** MRPC 1.8(a) provides:
"(a) A lawyer shall not enter into a business, financial or property transaction with a client unless:
(1) the transaction is fair and equitable to the client; and
(2) the client is advised to seek the advice of independent counsel in the transaction and is given a reasonable opportunity to do so. . . ."

(Safekeeping Property),[7] and 8.4(a), (c) and (d) (Misconduct).[8] The petitioner also alleged that the respondent violated Maryland Rule 16–609 (Prohibited Transactions)[9] and Maryland Code (2004 Repl. Vol., 2008 Supp.) § 10–306 of the Business Occupations and Professions Article.[10]

---

7. MRPC 1.15(a), (b) and (c) provide:
"(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account fund and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
"(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
"(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."

8. MRPC 8.4(a), (c) and (d) provide:
"It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
* * *
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice[.]"

9. Maryland Rule 16–609 provides:
"An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer."

10. Maryland Code (2004 Repl. Vol., 2008 Supp.) § 10–306 of the Business Occupations and Professions Article provides:

Pursuant to Maryland Rule 16–752(a), we referred the Petition to the Honorable Paul F. Harris of the Circuit Court for Anne Arundel County for the evidentiary hearing required by Maryland Rule 16–757.[11] Following that evidentiary hearing and the submission by both parties of Proposed Findings of Fact and Conclusions of Law, Judge Harris issued Findings of Fact and Conclusions of Law pursuant to Maryland Rule 16–757(c).[12] Judge Harris found that the respondent's sole act of professional misconduct involved a "technical violation of Rule 16–609." He also found that no attorney-client relationship existed between the respondent and Barbara Williams, his ex-girlfriend. Because he concluded that many of the Rule violations with which the respondent was charged required that the respondent be in an attorney-client relationship, Judge Harris determined that his finding of a lack of an attorney client relationship eliminated the possibility of the respondent facing disciplinary action on those allegations.

---

"A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

11. Maryland Rule 16–757 provides, in relevant part:

"(a) **Generally.** The hearing of a disciplinary or remedial action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in a circuit court. Unless extended by the Court of Appeals, the hearing shall be completed within 120 days after service on the respondent of the order designating a judge. Before the conclusion of the hearing, the judge may permit any complainant to testify, subject to cross-examination, regarding the effect of the alleged misconduct. A respondent attorney may offer, or the judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken relevant to the allegations. Bar Counsel may respond to any evidence or remedial action."

12. Maryland Rule 16–757(c) states:

"(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party."

*Findings of Fact and Conclusions of Law*

The respondent has been a member of the Maryland Bar since 1975, and, until now, has never had a charge of professional misconduct alleged against him. His office is located in Annapolis, Maryland, and his principal areas of practice include criminal defense, family law and personal injury law. The allegations of misconduct against the respondent arise from his prior relationship with Barbara Williams, a commercial real estate attorney and a member of the New York bar since 1981.

The hearing judge's Findings of Fact and Conclusions of Law outline the facts surrounding the relationship between the respondent and Williams:

"The Respondent and Williams became acquainted with each other in an alcohol rehabilitation facility, Father Martin's Ashley, in June of 2002. Originally, their relationship was a casual, friendship type relationship. However, once the Respondent and Williams left Father Martin's Ashley, the friendship developed into a romantic relationship. Over the course of the next year, the Respondent and Williams took a number of trips, including a vacation to Aruba and a trip to the Eastern Shore, where they attended a bar association event.

"According to the testimony of the Respondent and Williams' deposition, the couple confided in each other, supported each other, and discussed a variety of issues affecting their lives. Among other things, the Respondent and Williams discussed her divorce, her thoughts of returning to the active practice of law, and the Respondent's law practice. One of the issues discussed was the Respondent's desire to purchase a building in Annapolis for his law office. Williams was receptive to the idea of real estate as an investment and agreed to assist in the purchase of a building for Respondent's law office.

### Lease

"In April of 2003, Williams contemplated leasing the guesthouse on her property in Quogue, New York, to a tenant.

Although she had substantial real estate knowledge and experience, she asked Respondent if his office could send her a simple form lease. Respondent sent her a lease, along with a checklist. As Williams testified, this was a 'Blumberg form' that she might have obtained from any one of her friends. Williams testified that she knew Respondent had a general practice and did not purport to be a real estate attorney. The Court finds that Respondent and Williams did not have an attorney-client relationship in connection with the lease, and the form his office provided was one Williams could have obtained easily from a number of sources. In addition, Respondent did not charge a fee for this service."

### Williams' Relapse

"In June of 2003, Williams was residing in Florida, and the Respondent was residing in Maryland. The couple was still romantically involved and would travel to and from their respective locations to spend time with each other. While in Florida, Williams suffered a relapse and began drinking heavily. According to her own deposition, her drinking was 'out of control.' Williams' therapist advised, and she agreed, that she needed to enter a rehabilitation facility. However, the rehabilitation facility she intended to enter had a policy whereby patients are sequestered from the outside world, and Williams had financial issues that needed her attention. There was testimony that at least one of her credit accounts was past due. The Respondent volunteered to assist Williams in getting her affairs in order for her trip to rehabilitation and agreed to administer her finances while she was in the rehabilitation facility. In her deposition, Ms. Williams stated that she wanted the Respondent to handle her finances during this period because she trusted him and felt comfortable with such an arrangement. She also allowed Respondent to handle her finances because he was a recovering alcoholic and because he was a lawyer.

"The Respondent traveled to Florida before Williams entered the facility, helped her organize her personal and

financial affairs, and the two agreed that Respondent would help Williams by receiving her alimony checks, paying her bills, and otherwise administering her finances during her stay in the Florida rehabilitation facility.

### Power of Attorney & Authorization Letter

"On June 11, 2003, Respondent prepared a general power of attorney for Williams, authorizing Respondent to act on her behalf. Furthermore, Williams executed a letter stating that Respondent was authorized to act as her attorney. According to her deposition testimony, Williams executed these documents to allow the Respondent to administer her financial and personal affairs.

According to the Respondent's testimony and Williams' deposition, the specific purpose of the letter stating Respondent was her attorney was for the purpose of allowing Respondent to communicate with Williams while she was in rehab. The rehabilitation facility allowed patients to speak to their attorneys, but not to other non-family members. Apparently, the facility caught on to the deception, as it eventually prohibited Williams and the Respondent from speaking on the phone. Despite the plain language of the letter, Williams stated that she did not contemplate the Respondent would be doing any legal work on her behalf. The letter was not a representation agreement, and neither party intended to be part of an attorney client relationship. On or about June 14, Williams entered the Florida rehabilitation facility.

### Williams' Property

"Williams entrusted the Respondent with jewelry and other property, which he promised to keep safe while she was receiving treatment. Among the items of property entrusted to Respondent were a number of checks intended to be used for her bills. Williams provided Respondent with checks, and Williams' ex-husband sent Respondent her alimony checks, which were to be deposited into his escrow account. The parties agreed Respondent's law office staff

would be compensated for their bookkeeping services, but that Respondent would not charge Williams for the time he spent administering her finances. According to Respondent's testimony, the parties were 'boyfriend and girlfriend' at this point, and that he agreed to assist her for free because of the nature of their relationship.

"Three checks are of particular relevance in this case. On June 12, 2003, Williams wrote a check for $10,000 made payable to the Respondent. In the notation line Williams wrote 'Bills and expenses.' Williams' deposition states that these funds were for her bills and expenses. Also on June 12, 2003, Williams wrote a check for Respondent in the amount of $2,000. On the notation line she wrote 'Retainer.' Williams' deposition is conflicting as to the purpose of this check. At one point, she states she wrote this check to pay a retainer fee for Respondent's legal services and bookkeeping expenses. However, later Williams' testimony is that the $2,000 check was to be for her bills and to be for the bookkeeping costs associated with administering her accounts. The third check, dated, June 20, 2003, was in the amount of $10,000 made payable to the Respondent. In the notation line, she wrote 'Retainer.' However, in her deposition Williams clearly states that this notation was 'probably incorrect,' that it was not a retainer fee but rather was intended to be used to pay her bills and expenses.

"The confusion regarding the notations on the checks aside, the record is clear Respondent never charged Williams legal fees for the time he spent administering her finances. Furthermore, while Respondent was handling her finances, Williams periodically requested Respondent to send her funds, and Respondent always complied with these requests. Additionally, when Respondent left the Florida rehabilitation facility, he returned to her all the jewelry entrusted to him.

"However, Respondent admits that some of the checks that should have been deposited in the Respondent's escrow account were inadvertently deposited into the Respondent's operating account, but the Court is far from convinced that

this was done for any nefarious purpose. The Court finds no evidence that Respondent made any conscious decision to deposit the checks in his operating account or that he was aware they had been so deposited. Rather, the error regarding the escrow account was the result of sloppy bookkeeping by his staff, and, once it was noticed by the Respondent, he transferred the funds into the proper account. Williams was in no way prejudiced by these inadvertent clerical errors, and. the Respondent did not benefit from them.

*Loan for Defense Highway Property*

"While the Respondent was in Florida helping prepare Williams to enter the rehabilitation facility, she provided him with [a] $250,000 check to purchase a building on Defense Highway in Annapolis. In the notation line the check reads 'Building Investment.' It is clear there was not a meeting of the minds between Respondent and Williams regarding the purchase of this building. The Respondent was under the impression Williams was loaning the Respondent the money, and Williams believed her investment would be secured by the property itself, by a mortgage or deed of trust.

"However, the record is clear at the time the check was written, the Respondent executed a promissory note in the amount of $250,000, at an interest rate of 2.5 percent, in favor of Williams. The promissory note contained numerous protections for Williams, including a monthly interest payment, a late fee and a due date at which the remainder of the loan would be paid in full. In her deposition, Williams recalls discussing the building investment prior to her relapse in Florida, but does not remember if she asked the Respondent about receiving a mortgage on the property.

"Significant for the Court is Williams' deposition testimony that states she did not read the promissory note when she provided Respondent with the check in June of 2003. She's not sure what she did with her copy of the note, and

tellingly, did not look at the interest rate when she agreed to provide the loan. Not once did she ever object to the terms of the loan, including the interest rate. In fact, through the filing of this Complaint, Williams accepted monthly interest payments without objection. Given her testimony, it is apparent this loan was one between a 'boyfriend and girlfriend' and not a commercial transaction between an attorney and his client. The Court finds that Respondent was not serving as her attorney at the time the loan was made and that Williams did not seek any advice from Respondent as an attorney at that time. It should be noted again that Williams is an attorney experienced in commercial transactions.

### Representation Agreement

"Per the terms of their prior agreement, Respondent administered Williams' affairs while she was a patient at the Florida rehabilitation facility. After she was released in July of 2003, Williams relocated to New York. On or about July 26, 2003, the Respondent traveled to New York to meet with Williams. While there, Respondent and Williams discussed his law practice, the new building, and Williams' finances. The parties also mentioned a written legal representation agreement. According to the agreement, Williams hired the Respondent to structure financial matters and pay bills. The agreement also served to extend the June 11 power of attorney through December 31, 2003. The Court was not provided with a signed copy of the agreement and does not assume one exists. On the signature lines for Williams and Respondent, the '/s/' symbol is written. Respondent testified that he was not certain Williams had signed the agreement, but, that if he or someone else put that symbol there, it was because there was a copy somewhere with signatures. While being deposed, Williams claims that she did not recall requesting or receiving a copy of the legal representation agreement. After spending a few days in New York, the Respondent

returned to Annapolis and continued administering her finances.

*February—March 2004*

"The romantic nature of their relationship came to an end in late fall or early winter of 2003. However, Respondent continued receiving Williams' alimony checks and paying her bills, per her request. In February of 2004, Williams reconsidered the loan for the building and the bill paying arrangement. After discussing the loan and arrangement with an old law school friend, Mr. Jeffreys (Jeffreys), Williams decided to terminate the financial arrangement. Jeffreys drafted and sent a letter notifying Respondent of her decision and requested the Respondent provide him with an accounting of Williams' affairs. Respondent sent Jeffreys an accounting and $13,092.28, the balance of Williams' funds from Respondent's escrow account. With regards to the $250,000 loan, Williams received the interest payments due under the terms of the promissory note. After March, 2004, Williams asked Respondent to continue receiving alimony checks from her ex-husband.

*March 2005*

"The arrangement came to a complete halt in March 2005 when Respondent received a demand letter from Williams' attorney, Ms. McKee. The letter demanded Respondent return the $250,000 loan, plus an additional $50,000 for Williams' expenses, and in return, Williams would provide Respondent with a general release. Williams had never before demanded repayment of the loan. Respondent acquiesced, paid Williams $300,000, and received a release letter from Williams. The Court notes that Williams was not financially harmed by the loan arrangement, as she was returned the full loan amount plus $50,000. The Court does not have an itemized expense sheet, but it appears that the $50,000 should have more than compensated Williams for her expenses. The amount seems excessive to this Court. However, believing an ethical violation had occurred, Ms.

McKee notified the Attorney Grievance Commission of the relationship between Respondent and Williams, giving rise to this case. The Court notes that it was Ms. McKee, not Williams, who filed the Complaint. At that point, Williams was satisfied with her compensation.

"At her deposition, Williams testified that despite the allegations of her lawyer's draft civil complaint, she believed that Respondent meant well, that he cared about her, and that his motivation was to help her[.] Williams also testified that Respondent was a good attorney[.] Finally, she testified that, in connection with these proceedings, she does not want to see him harmed." (Citations to the record omitted).

As indicated, Judge Harris also concluded that no attorney-client relationship ever existed between the respondent and Williams. The basis for that conclusion was set out in the Findings of Fact and Conclusions of law, as follows:

"In her deposition testimony, Williams stated the friendship and romance came first and the various financial arrangement[s] were secondary. Respondent testified that at no time did he intend to act as her lawyer, and that he assisted her with paying bills because she was his girlfriend. Prior to possible execution of the representation agreement, neither the Respondent nor Williams were under the impression or acted as if Respondent was Williams' attorney. The Court concludes that Petitioner did not prove by clear and convincing evidence that an attorney client relationship existed. The Court was not provided with a representation agreement signed by both parties and is not convinced that one was signed." (Citations to the record omitted).

Having determined that no attorney-client relationship ever existed between the respondent and Williams and believing that such a relationship is necessary to finding a violation of MRPC 1.1, 1.8(a) or 1.15(a) and (c), Judge Harris accordingly ruled in favor of the respondent as to the alleged professional misconduct premised on those Rules. As to each allegation of professional misconduct based on those Rules, Judge Harris commented, as follows:

### Rule of Professional Conduct 1.1

"The Petitioner alleges Respondent violated Maryland Lawyers' Rule of Professional Conduct 1.1, Competence. The rule states, '[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.'

"The Petitioner has failed to prove by clear and convincing evidence the respondent violated Rule 1.1. Petitioner provided Williams with competent assistance throughout their relationship. This Rule only applies to acts or omissions during what could be considered an attorney client relationship. Since no attorney client relationship existed, there was no violation. In addition, through[out] her testimony, Williams never alleged incompetence on the part of the Respondent.

\* \* \*

### Rule of Professional Conduct 1.8

"The Petitioner alleges Respondent violated Maryland Lawyers' Rule of Professional Conduct 1.8, Conflict of Interest: Current Clients, Specific Rules. The Petitioner makes allegations as to rule 1.8(a), so only that section will be discussed. Petitioner has charged respondent with the version of Maryland Rule of Professional Conduct 1.8 in effect during the time of the alleged misconduct, so that version will be used.

"This Rule provides that a lawyer shall not enter into a business, financial or property transaction with a client unless: (1) the transaction is fair and equitable to the client; and (2) the client is advised to seek the advice of independent counsel in the transaction and is given a reasonable opportunity to do so. In order for Respondent to have violated this rule, there must have been an attorney-client relationship between Williams and Respondent. The Court finds by clear and convincing evidence that no attorney-client relationship ever existed between Williams and Re-

spondent. The Petitioner has failed to prove by clear and convincing evidence the respondent violated Rule 1.8(a).

### *Rule of Professional Conduct 1.15*

"The Petitioner alleges Respondent violated the following provision of Maryland Lawyers' Rule of Professional Conduct 1.15(a), (b), and (c): Safekeeping Property. The Rule in effect in 2003 will be used, as Petitioner alleges Respondent broke the rule at that time. According to the rule, a lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation. (a)

"Petitioner failed to prove by clear and convincing evidence that Respondent is in violation of 1.15(a). This Rule applies to lawyers who are holding the property of third persons in connection with representation. Since there was no attorney client relationship, Respondent could not have violated 1.15(a).

\* \* \*

"Additionally, the Rule [MRPC 1.15] imposes a duty that when in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. (c) Petitioner failed to prove by clear and convincing evidence that Respondent violated 1.15(c). Petitioner alleges, in its Proposed Findings of Fact and Conclusions of Law, that a violation occurred on June 12, 2003. The Court has found that an attorney-client relationship did not exist at that time."

Although it does not necessarily depend upon an attorney-client relationship, Judge Harris concluded that the petitioner failed, as well, to prove by clear and convincing evidence that the respondent violated MRPC 1.15(b). That was because "[w]hen Williams, through her lawyer, requested an accounting and on the occasions when Ms. Williams requested the delivery to her of funds maintained in Respondent's escrow account, Respondent promptly rendered a full accounting and provided the requested funds, even though he was not acting in the capacity of her attorney."

With regard to the allegations of misconduct based on MRPC 1.4 and 1.7, Judge Harris determined that they were waived; he noted that the petitioner did not argue at the evidentiary hearing that these rules were violated by the respondent. Judge Harris concluded that, since the "Petitioner ... has not argued that these rules were violated," no findings would be made as to whether the respondent violated these rules.

Neither did the respondent violate MRPC 8.4,[13] Judge Harris found. As to the allegations based on that rule, he pointed out:

"Petitioner alleges Respondent violated the following provision of Maryland Lawyers' Rule of Professional Conduct 8.4: Misconduct. It is professional misconduct for a lawyer to: engage in conduct involving dishonesty, fraud, deceit or misrepresentation (c). The court need not find that the conduct occurred during the practice of law to find this rule was violated. The Court finds that Petitioner did not present clear and convincing evidence that Respondent acted dishonestly, fraudulently or deceitfully or that he misrepresented any material fact.

"The Petitioner alleges Respondent violated the following provision of Maryland Lawyers' Rule of Professional Conduct 8.4: Misconduct. It is professional misconduct for a

---

**13.** The hearing judge did not discuss the MRPC 8.4(a) allegation of professional misconduct originally brought against the respondent because the petitioner only discussed MRPC 8.4(c) and (d) in its Proposed Findings of Fact and Conclusions of Law.

lawyer to: engage in conduct that is prejudicial to the administration of justice (d). The court need not find that the misconduct occurred during the practice of law to find that this rule was violated. Again, the Court concludes there is not clear and convincing evidence to find that the Petitioner violated this rule."

Penultimately, it was Judge Harris' conclusion that the petitioner failed to prove by clear and convincing evidence that the respondent's conduct violated Maryland Code § 10–306 of the Business Occupations and Professions Article. He reasoned:

"The Petitioner alleges Respondent violated the following provision of Business Occupations and Professions Article, Annotated Code of Maryland § 10–306: Misuse of Trust Money. According to this section, a 'lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.' Unlike Rule 16–609 and MRPC 1.15, in order to find this statute was violated, there must be evidence that the attorney's conduct was willful or that the attorney acted with a general intent. The court need not find that an attorney-client relationship existed between Respondent and Williams to find that this rule was violated. Since Petitioner has not shown that Respondent's client trust account discrepancies were willful, the Court concludes that there is not clear and convincing evidence to find Respondent in violation of this section." (Citations omitted).

Finally, after reviewing all of the evidence, Judge Harris found that the only allegation of misconduct established by the petitioner was that the respondent violated Maryland Rule 16–609. That finding was based on his determination that certain checks, which initially should have been deposited into the firm's escrow account, were first, albeit inadvertently, deposited into the respondent's firm operating account.

### Standard of Review

It is well settled that this Court has original and complete jurisdiction over attorney disciplinary proceedings.

*Attorney Grievance Comm'n v. Maignan,* 390 Md. 287, 292, 888 A.2d 344, 347 (2005); *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996); *Attorney Grievance Comm'n v. Kent,* 337 Md. 361, 371, 653 A.2d 909, 914 (1995); *Attorney Grievance Comm'n v. Joehl,* 335 Md. 83, 88, 642 A.2d 194, 196 (1994). In such proceedings, we deem the factual findings of the hearing judge to be prima facie correct, and we will not disturb them on review unless they are proven to be clearly erroneous. *Attorney Grievance Comm'n v. Ward,* 394 Md. 1, 15, 904 A.2d 477, 486 (2006); *Attorney Grievance Comm'n v. Kahn,* 290 Md. 654, 678, 431 A.2d 1336, 1349 (1981). Our review of the hearing judge's legal conclusions, however, is *de novo.* Maryland Rule 16–759(b).[14] Thus, "[a]ny conclusions of law made by the hearing judge, such as whether provisions of the MRPC were violated, are subject to our *de novo* review." *Attorney Grievance Comm'n v. O'Toole,* 379 Md. 595, 604, 843 A.2d 50, 55 (2004) (citing *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002)).

The petitioner has filed several exceptions to several of the hearing judge's findings of fact and conclusions of law.

### Factual Exception

■ The petitioner's first exception is that the hearing judge erred in not mentioning that the respondent wrote checks on the firm's escrow account made payable to "cash." The petitioner believes, and therefore argues, that this conduct is an additional basis for finding that the respondent violated Maryland Rule 16–609. It concludes that it was error for Judge Harris not to have included it in his findings in that regard. The hearing judge, however, does not have to address each and every piece of evidence presented at the evidentiary hearing. *Attorney Grievance Comm'n v. Sheri-*

---

14. Maryland Rule 16–759(b) provides, in relevant part:
 (b) **Review by Court of Appeals.** (1) Conclusions of law. The Court of Appeals shall review de novo the circuit court judge's conclusions of law.

*dan,* 357 Md. 1, 17, 741 A.2d 1143, 1152 (1999) (noting that the hearing judge may elect which evidence to rely upon in rendering his findings and conclusions). In *Attorney Grievance Commission v. Braskey,* 378 Md. 425, 446, 836 A.2d 605, 618 (2003), we explained:

> "We are unable to say why the hearing judge omitted reference to respondent's testimony regarding the February calls. It may be that the judge did not believe respondent; it may have been an oversight. In any case, even if the judge believed respondent, the hearing judge is not required to recount all of the evidence presented at the hearing." (Citation Omitted).

Therefore, the petitioner's exception, to the extent it challenges the findings of fact relied on by the hearing judge in concluding that the respondent violated Maryland Rule 16–609, is overruled.

### *Attorney–Client Relationship*

The petitioner next excepts to the hearing judge's failure to find that an attorney-client relationship existed between the respondent and Williams.[15] That failure, it submits, is clear error. Proffering that the record is replete with clear and unambiguous evidence that the respondent and Williams had an attorney-client relationship, the petitioner cites as but one example of such evidence, the fact that the respondent prepared legal forms for Williams, while visiting her in Florida in June of 2003, before she entered an alcohol rehabilitation facility. In particular, the petitioner points out, the respondent prepared a General Power of Attorney for Williams that appointed him as her attorney-in-fact. It asserts, on this basis, that the respondent acted as if he was Williams' attorney, resulting in the creation of an attorney-client relationship.

---

**15.** We note that the petitioner, without citing to any case law or Maryland Rule, proffers that whether an attorney-client relationship exists is a conclusion of law that is subject to *de novo* review by this Court.

The petitioner also contends that an attorney-client relationship arose between the respondent and Williams when he provided her with a form lease and checklist in April of 2003, so that she could lease out residential property that she owned in New York. In that regard, the petitioner argues that correspondence between the two, drafted by both the respondent and Williams, contrary to the oral testimony,[16] suggests that they perceived that an attorney-client relationship existed between them. In further support of its argument, the petitioner notes that Williams wrote the word "retainer" on a $2,000 check that she gave to the respondent around June 12, 2003. Moreover, it points out, the respondent drafted two letters that were signed by Williams, in which the respondent is referred to as Williams' attorney.[17] Additionally, the peti-

---

**16.** As indicated previously, Williams did not testify at the evidentiary hearing before Judge Harris. She limited her involvement in this matter to providing deposition testimony.

**17.** The first letter, dated June 12, 2003, reads as follows:

"I, Barbara M. Williams, do hereby authorize my attorneys, Shoup and Associates, 1214 West Street, Annapolis, MD 21401, and specifically, Jonathan H. Shoup, Esquire, of that firm, to discuss and obtain any and all records, documents, statements and any and all data and disclose any and all information necessary to aid in their representation of me in my various financial, business, personal (including domestic) affairs.

"PLEASE ASSIST THEM IN ANY WAY POSSIBLE. Thank you in advance for your cooperation.

"/s/ Barbara M. Williams"

The second letter, also dated June 12, 2003, provides:

"I, Barbara M. Williams, do hereby authorize my attorneys, Shoup and Associates, 1214 West Street, Annapolis, MD 21401, and specifically, Jonathan H Shoup, Esquire, of that firm, to discuss and obtain any and all records, documents, statements and any and all data and disclose any and all information necessary to aid in their representation of me in my various financial, business, personal (including domestic) affairs.

"I further authorize you to discuss my progress here at the Beachcomber with Diana Burns and Dr. Martin Gross, MD and Jonathan Shoup, Esquire.

"I further authorize you to place the following on my visitor and access list here at the Beachcomber Center: Diana Burns, my therapist and Dr. Martin Gross, MD and Jonathan Shoup, Esquire, my personal attorney.

tioner maintains, the respondent, in his written communications with Williams' creditors, while she was attending the Florida rehabilitation facility, held himself out as her lawyer.[18]

The respondent's handling of Williams' checks, while she was admitted in the rehabilitation facility is yet another basis for the petitioner's argument that the respondent was Williams' attorney; it evidences, the petitioner avows, the respondent's belief that he thought an attorney-client relationship existed between him and Williams. The petitioner maintains that, if the respondent did not believe that an attorney-client relationship existed, then he likely would not have felt compelled to abide by the protocol requiring that attorneys deposit client funds in the firm's escrow account. Moreover, the petitioner sees the respondent's admission that some of Williams' checks were inadvertently deposited into his operating account, instead of his escrow account, as clear evidence that the respondent believed that an attorney-client relationship existed between him and Williams. As additional evidence that the respondent and Williams had an attorney-client relationship, the petitioner directs our attention to an un-

---

"PLEASE ASSIST THEM IN ANY WAY POSSIBLE. Thank you in advance for your cooperation.
"/s/ Barbara M. Williams"

18. The petitioner refers us to a July 8, 2003 letter drafted by the respondent to one of Ms. Williams' creditors. That letter reads as follows:

"Dear Sir or Madam,
"We are legal counsel to Barbara Williams. With regard to the above-referenced account, find the enclosed copy of an authorization signed by our client giving us the authority to contact you with regard to this matter.
"On July 3, 2003, our office contacted the above-referenced creditor for the purpose of resolving this debt for our client. We are enclosing a copy of the Statement of Account which resulted from our negotiations of that date showing a 'courtesy adjustment' and a zero balance due on this account.
"Please note your records with this information. This matter has been resolved and should result in the closing of your file. Please confirm this in writing to our office. Thank you.
"Sincerely yours,
"/s/ Jonathan H. Shoup"

signed [19] Legal Representation Agreement between Shoup and Associates and Williams. The respondent's testimony indicates that he drafted this document and took it up to New York so that Williams, having finished her rehabilitation in Florida, could sign it while the two enjoyed a weekend at her summer home. The hearing judge, in his written Findings of Fact and Conclusions of Law, explicitly refused to assume that a signed copy of the Representation Agreement existed.

The petitioner argues that even though no signed copy of the Legal Representation Agreement can be found, the unsigned copy still serves as clear and convincing evidence that

---

19. The signature blocks of the Legal Representation Agreement lack signatures, but, instead, have an "/s/." At the evidentiary hearing, on this very issue, the respondent testified, as follows:

"[Counsel]: All right. Look at page 27, the second page of the legal representation agreement.
"[Respondent]: Right.
"[Counsel]: Now that does not have Barbara Williams' signature?
"[Respondent]: That's correct.
"[Counsel]: Where is the signed copy of the engagement agreement?
"[Respondent]: I'm not sure it was ever signed, because she said why are we needing this.
"[Counsel]: Well doesn't that S and the slashes on the signature line, doesn't that mean that it has been signed—
"[Respondent]: You asked me where is the signed copy and I said, I'm not sure if it was ever signed. If I put an S there or whoever put the S there it was because there was a copy somewhere signed. I would think."

The hearing judge also engaged in colloquy with the respondent to clarify whether Williams actually ever signed this document:

"[The Court]: Okay. This document [referring to the Legal Representation Agreement] is date[d] July 26th, but as I indicated it is not signed.
"[Respondent]: That's correct.
"[The Court]: Did she ever sign this in your presence?
"[Respondent]: I don't remember. I would think that she probably did if I put a slash, but I don't remember. I don't know.
"[The Court]: Do you recall signing it?
"[Respondent]: I don't remember. It was not an issue. This was not a big part of our weekend.
"[The Court]: Well who dated it?
"[Respondent]: Who put the date in?
"[The Court]: There is a date—it is typed in.
"[Respondent]: Yes. I know I brought that up with me.
"[The Court]: Okay. Go ahead, Counsel."

the respondent believed he had, in addition to a personal relationship with Williams, an attorney-client relationship with her as well. The petitioner also argues that the respondent's acquiescence to the March 2004 letter drafted by E. Lewis Jeffries, Esquire, a friend of Williams, referring to the respondent as Williams' "attorney," and the respondent's failure to correct this characterization in his reply, suggests that the respondent agreed that an attorney-client relationship existed between him and Williams. Moreover, the respondent's inclusion of a document detailing the value of the "legal services" provided by Shoup and Associates, although not charging Williams for those "legal services, only further indicates that there was an attorney-client relationship between the respondent and Williams.

■■■ As an initial matter, we acknowledge that determining "what constitutes an attorney-client relationship is a rather elusive concept." *Attorney Grievance Comm'n v. Shaw,* 354 Md. 636, 650, 732 A.2d 876, 883 (1999) (quoting *Folly Farms I, Inc. v. Trustees,* 282 Md. 659, 670, 387 A.2d 248, 254 (1978)). The facts and circumstances of each particular case are critical in determining whether an attorney-client relationship exists. *See Shaw,* 354 Md. at 650–51, 732 A.2d at 883. A key factor that courts look to is whether the purported "client" sought legal advice. *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 421, 718 A.2d 1129, 1141 (1998). Certainly, an attorney-client relationship still can be found even though the attorney renders services or advice that is not strictly legal in character. *See, e.g., Page v. Penrose,* 147 Md. 225, 227–28, 127 A. 748, 749 (1925). Moreover, a personal relationship or close friendship with a purported "client" does not preclude a court from finding that an attorney-client relationship exists. *Attorney Grievance Comm'n v. Brooke,* 374 Md. 155, 175, 821 A.2d 414, 425 (2003). Our cases make clear that an explicit agreement or payment arrangement is not a prerequisite to the formation of an attorney-client relationship. *Attorney Grievance Comm'n v. James,* 355 Md. 465, 476–77, 735 A.2d 1027, 1033 (1999) (quoting *Central Cab Co. v. Clarke,* 259 Md. 542, 549–50, 270

A.2d 662, 666 (1970)). The Restatement (Third) of the Law Governing Lawyers outlines the typical and usual requirements of an attorney-client relationship. It provides:

"A relationship of client and lawyer arises when:

"(1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either

"(a) the lawyer manifests to the person consent to do so; or

"(b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or

"(2) a tribunal with power to do so appoints the lawyer to provide the services."

The hearing judge's determination as to whether an attorney-client relationship existed between the respondent and Williams will not be overturned by us unless the petitioner demonstrates that the judge's finding was clearly erroneous. *Attorney Grievance Comm'n v. Brooke*, 374 Md. 155, 176, 821 A.2d 414, 426 (2003); *see also Crest Investment Trust, Inc. v. Comstock*, 23 Md.App. 280, 297, 327 A.2d 891, 902 (1974). There is ample evidence in the record to support the hearing judge's conclusion that no attorney-client relationship existed between the respondent and Williams. For example, in her deposition testimony, Williams made it clear that she never intended for the respondent to provide her with legal services; such testimony is a key factor in a court's attorney-client inquiry.[20]

---

**20.** In her deposition, Barbara Williams made it clear that she never intended for the respondent to render legal services on her behalf:

"[Counsel]: Am I right that what was contemplated there was not really legal work, but rather the receipt of money and payment of bills, and keeping track of it?
"[Williams]: Right.

The facts reveal that the respondent did not charge a fee for his services and only sought to assist Williams in managing her financial affairs while she received treatment for her alcohol abuse.[21] The hearing judge specifically found that neither the respondent nor Williams, at any point in time, acted as if, or operated under the impression that, an attorney-client relationship existed.

The petitioner's insistence that an attorney-client relationship was created when the respondent gave Williams a form

---

"[Counsel]: In the case of Mr. Shoup, and that is in the case at hand where his office undertook to do it, did you understand that basically his staff would be doing this on a day-to-day basis?
"[Williams]: Yes."
(Williams Deposition at 84).

21. The respondent testified about his role in assisting Williams with her bills while she entered the rehabilitation facility in Florida:
"[Counsel]: All right. Coming back again to that period of time in June of 2003, did you agree to take over the chore of receiving her [Ms. Williams'] alimony payments and paying out her bills as they came due?
"[Respondent]: I was more than willing and happy to help her out, boyfriend and girlfriend, with taking care of getting her bookkeeping and financing stuff straightened out. But I didn't know about the alimony then.
"[Counsel]: All right. Well, did you understand that somebody would have to give you some money with which to pay the bills?
"[Respondent]: She said she'd supply me the money to do that.
"[Counsel]: All right. And did you have a discussion with her about how this would be done? How the bill paying would occur?
"[Respondent]: I said that we have a part-time bookkeeper, will build a process to handle that for you. I'll charge you for the time of the bookkeeper because I got to keep the office moving. But I said you're not a client, you're my girlfriend. I would never charge you anything.
"[Counsel]: As of that point in time when you agreed that your office would pay her bills, did you believe that you were serving as her attorney?
"[Respondent]: No, sir.
"[Counsel]: Why not?
"[Respondent]: She's my girlfriend. It's sort of like a member of your family. I was thinking this morning, Inns of Court,——is the Inns of Court now my client or am I doing that because it's something I want to do?
"[Counsel]: Okay.
"[Respondent]: At no time did I think she was my client." (Direct Examination of Jonathan Shoup at 100–01).

lease to use in leasing out one of her New York properties is unpersuasive and not supported by the evidence. The hearing judge found that Williams was an attorney with substantial experience in real estate. The lease provided by the respondent was nothing more than a basic lease that Williams could have acquired from any one of her friends or former colleagues. The hearing judge's conclusion about the respondent's provision of this basic lease to Williams is supported by the fact that the respondent had a general practice, never held himself out to be a real estate attorney and never charged Williams a fee for the lease.

The petitioner asserts that the hearing judge also erred by not according sufficient weight to the correspondence and documents in the record in determining whether an attorney-client relationship existed between the respondent and Williams. The first document that the petitioner points to is the General Power of Attorney that was prepared by the respondent and signed by Williams before she entered the rehabilitation facility. According to the petitioner, the respondent's preparation of this legal document for Williams' signature was the practice of law and gave rise to an attorney-client relationship. Based on the context in which this document was prepared by the respondent, coupled with Williams' deposition testimony, we conclude that the petitioner's assertion is without merit. The General Power of Attorney was created to allow the respondent "to administer [Williams'] financial and personal affairs." Findings of Fact and Conclusions of Law at 4. In fact, the petitioner does not direct us to any evidence in the record indicating that, after the execution of this General Power of Attorney by Williams, the respondent did anything other than receive Williams' alimony checks, pay her bills and negotiate with her creditors when the need arose.

The petitioner's next contention is that the Authorization Letters, drafted by the respondent and signed by Williams, gave rise to an attorney-client relationship. In the Authorization Letters, Williams refers to the respondent as one of her attorneys. The hearing judge found that these letters were drafted for the specific purpose of "allowing Respondent to

communicate with Williams while she was in rehab," as the "rehabilitation facility allowed patients to speak to their attorneys, but not to other non-family members." Findings of Fact and Conclusions of Law at 4. The petitioner presents no evidence, besides the plain language in the documents themselves, to contradict the hearing judge's finding that the Authorization Letters, in effect, were a pretext to permit the respondent to contact his girlfriend while she went through a rigorous rehabilitation program.[22] Indeed, it appears that, at some point, the rehabilitation facility caught on to the true nature of their relationship and prevented them from speaking on the phone for the remainder of her stay at the facility.

Judge Harris was not impressed by the petitioner's contention that the unsigned Representation Agreement that was drafted by the respondent gave rise to an attorney-client relationship. In his Findings of Fact and Conclusions of Law, Judge Harris made it clear that he would "not assume" that a signed copy of the Representation Agreement existed and that he was not convinced that one had been signed by the parties. Findings of Fact and Conclusions of Law at 8. The petitioner has failed to prove by clear and convincing evidence that the hearing judge erred in concluding that no Representation

---

**22.** Williams testified about the rehabilitation facility's strict telephone policy and the reason she referred to the respondent as her "lawyer":

"[Counsel]: Why are you providing those to him, those phone numbers?

"[Williams]: I think because my phone conversations were so limited, I was the only person in the treatment facility who didn't have parents or a husband. So there was no one to like if you go into treatment usually there is a person who can kind of run your life for you, and I didn't have that person. So I gave Jonathan [the respondent] the numbers to let—because I couldn't speak to the children all the time, but they let me speak to him because he was my lawyer.

"[Counsel]: And you had given him that authority to be on your list?

"[Williams]: Yes, and so they eventually stopped me from talking to him, because they said I was on too long with him, but initially they would say call for me, you are allowed to get call from your lawyer so I gave him the numbers.

"[Counsel]: This sounds a lot like jail, because the inmates can talk to their lawyers as much as they want.

"[Williams]: I know, there are similarities."

Agreement was executed between Williams and the respondent. The facts reveal that neither the respondent nor Williams recalled signing a Representation Agreement, and neither, as stated in the respondent's testimony and Williams' deposition, intended to create an attorney-client relationship in any way. To the contrary, the respondent testified that the reason he drafted the Representation Agreement was to extend the General Power of Attorney, which had lapsed, through December 31, 2003, so he could continue handling Williams' financial affairs.

The final piece of documentary evidence that the petitioner suggests gave rise to an attorney-client relationship involves two checks, containing the notation, "retainer," written by Williams, and made payable to the respondent. The petitioner asserts that Williams' notation of "retainer" provides clear and convincing evidence that she believed an attorney-client relationship existed between her and the respondent. Williams' deposition testimony regarding the purpose for the $2,000 check was conflicting. At one point in her deposition, Williams testified that the check was to pay a retainer fee for the "respondent's legal services and bookkeeping expenses." Later on in her deposition, she contradicted the explanation offered in the previous statement and explained that the check really was intended to be used to pay her bills and the bookkeeping expenses incurred by the respondent in administering her accounts. Similarly, Williams asserted that the "retainer" notation made on the $10,000 check payable to the respondent was "probably incorrect," as that check, along with the other checks made payable to the respondent, was "intended to be used to pay her bills and expenses." The petitioner has presented no evidence that the hearing judge clearly erred in viewing the notations on these checks as insufficient to give rise to an attorney-client relationship, especially in light of the subsequent explanations provided by Williams at her deposition. Thus, the petitioner's exception to the hearing judge's finding that no attorney-client relationship existed between the respondent and Williams is overruled.[23]

_____

23. As a result of our affirmation of the hearing judge's finding on this issue, the respondent cannot be subject to discipline for allegedly

## MRPC 1.15(b)

 We now turn to the petitioner's exception to the hearing judge's conclusion that the respondent did not violate MRPC 1.15(b). The petitioner posits, without citing to any testimony or evidence in the record, that the respondent violated MRPC 1.15(b) by not rendering a full accounting of all of the funds received and disbursed on Williams' behalf in his March 30, 2004 letter to E. Lewis Jeffries, Jr. The petitioner states that the respondent's list of transactions supplied to Jeffries understated the deposits and overstated the expenditures made or charged by the respondent and his staff while managing Williams' financial affairs. According to the petitioner, this is clear and convincing evidence that the respondent violated MRPC 1.15(b).

As we have stated repeatedly, the findings of the trial judge are *prima facie* correct and will not be disturbed unless shown to be clearly erroneous. *Attorney Grievance Comm'n v. Link,* 380 Md. 405, 420, 844 A.2d 1197, 1206 (2004) (citing *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997)). The party excepting to the hearing judge's factual findings, in this case the petitioner, has the burden of coming forward with evidence to establish that the trial judge's findings on a particular issue were clearly erroneous. *Attorney Grievance Comm'n v. Post,* 379 Md. 60, 74, 839 A.2d 718, 726 (2003). The petitioner's conclusory statement that the respondent violated MRPC 1.15(b), in the face of Judge Harris's specific finding that the respondent rendered a full accounting to Williams of the financial transactions executed on her behalf, is wholly insufficient to convince us that the hearing judge was clearly erroneous. Therefore, we overrule the petitioner's exception.

---

violating MRPC 1.1, 1.8(a) or 1.15(a) and (c), as these Rules of Professional Conduct require the existence of an attorney-client relationship. The petitioner, in its written Exceptions and Recommendation of Sanction, concurs that the above MRPC require the existence of an attorney-client relationship in order for an attorney to face discipline.

### MRPC 8.4

 The petitioner next excepts to the hearing judge's conclusion that the respondent violated MRPC 8.4(c) or (d). With regard to MRPC 8.4(c), the petitioner argues that, by offering evidence as to the respondent's handling of both Williams' loan and the promissory note executed in her favor, it presented clear and convincing evidence that the respondent "engaged in conduct involving dishonesty, fraud, deceit or misrepresentation." Petitioner's Exceptions and Recommendation of Sanction at 31. The petitioner proffers that the respondent acted fraudulently by leading Williams to believe that her $250,000 loan would garner her an ownership interest in, or would be secured by, the Defense Highway building that the respondent subsequently purchased, in part, using the money she loaned him. As proof that Williams was deceived, the petitioner points to the notation, "investment," that Williams wrote on the loan check. Additionally, the petitioner contends that the text of the promissory note [24] executed between the respondent and Williams, stating that the note was "secured" by real property, was dishonest because, in actuality, the note never was secured by any real property. Alternatively, the petitioner argues that even if the respondent did not intend to mislead Williams about the prospect of her obtaining an ownership interest in the building, the respondent still acted deceitfully by failing to inform her that she was not going to obtain such an interest after her repeated inquiries on the subject. As additional evidence of the respondent's deceitful conduct, the petitioner asserts that the respondent failed timely to pay the monthly interest payments

---

**24.** The promissory note provided by the respondent to Williams reads, in part, as follows:

"This Note is secured by aA (sic) Building purchased by JHS, LLC in the area of Annapolis, MD and if not by the property known as 518 Moorings Circle, Arnold, MD 21012, dated June 11, 2003. The Lender is not required to rely on the above security instrument and the assets secured therein for the payment of this Note in the case of default, but may proceed directly against the Borrower."

owed to Williams on the executed promissory note, all the while concealing that delinquency from her.

The petitioner's recitation of the facts on this issue is fairly loose. The colloquy between the hearing judge and Bar Counsel, concerning whether Williams' anticipated or requested a mortgage or ownership interest in the Defense Highway building, is telling:

"[Bar Counsel]: When you [Mr. Shoup] returned to Maryland after receiving the $250,000, you didn't take the note to the Courthouse in June to record it? Correct?

"[Respondent]: Ma'am, we have also gone over this several times. I know this is the time it counts, but as I explained then I didn't even think about trying to record a promissory note, because I thought $1,300,000 in [personal] assets was better security than the equity difference on Defense Highway. In theory I still believe that. I didn't even think about doing it until I got the letter from Louis Jeffries saying, please furnish any deeds of trust. And I went down to do it and I—

"[The Court]: Wait a minute. That was in March of '04. This case is very time sensitive, Counsel, and you are jumping like seven months ahead.

"[Bar Counsel]: Your Honor, my question was, did he try to record the promissory note in June of 2003?

"[The Court]: It was never requested before then, Counsel. That has been an undisputed fact. It was never—

"[Bar Counsel]: Your Honor, he told the lender he was going to secure the note.

"[The Court]: On which property are you talking about?

"[Bar Counsel]: On the $250,000 loan.

"[The Court]: He told who?

"[Bar Counsel]: Barbara Williams.

"[The Court]: That he was going to do a deed of trust in June of '03. I don't think there is a piece of evidence that says that.

"[Bar Counsel]: The note says that the loan will be secured. Mr. Shoup testified earlier that he intended to record the promissory note, found out in March that he could not do that.

"[The Court]: Well I am looking at it and it doesn't say that. But go ahead, ask your question. Let me just set the record straight. No one requested Mr. Shoup to give a deed of trust until he got the letter in March of '04, is that correct?

"[Bar Counsel]: That is correct." (Transcript 7/11/2007 at 204).

Although the above colloquy is not cited or referred to by Judge Harris in his written Findings of Fact and Conclusions of Law, we view as an admission Bar Counsel's concession that it was not until March, 2004 that the respondent was asked by anyone to secure a deed of trust in Williams' favor. Thus, Williams could not have had any reasonable expectation of acquiring a mortgage or deed of trust on the Defense Highway building until March, 2004. In that regard, Judge Harris found telling Williams' testimony that she, an experienced real estate attorney, did not look at the interest rate on the promissory note before providing the respondent with such a substantial amount of money. According to Judge Harris, it was apparent that this loan was between a "boyfriend and girlfriend." We agree and conclude that the respondent's conduct with regard to the loan and the promissory note did not amount to dishonest, fraudulent or deceitful conduct. To the contrary, the facts indicate that Williams never requested that the respondent secure a mortgage or deed of trust in her favor on the Defense Highway Property until March of 2004. It is also significant, as it must have been to the hearing judge, that, after receipt of Williams' letter, which was drafted by Jeffries, it is uncontested that the respondent immediately, although unsuccessfully, went to the courthouse to record the promissory note executed between him and Williams.[25]

---

**25.** The following testimony was elicited from the respondent with respect to his attempt to secure a deed of trust for Williams:

The petitioner also argues that the respondent violated MRPC 8.4(d) in that he "failed to safeguard trust funds, commingled trust money in his office account, used funds for unauthorized purposes and failed to accurately account for trust funds." Moreover, the petitioner proffers that the respondent took advantage of Williams by securing, in relation to the prevailing commercial interest rates available, a low interest and unsecured loan from her, knowing that she was in such a vulnerable state. Again, the petitioner has failed to meet its burden of proving that the respondent's conduct was prejudicial to the administration of justice.

In *Attorney Grievance Commission v. Link*, 380 Md. 405, 429, 844 A.2d 1197, 1211–12 (2004), we enunciated the test for determining whether a lawyer's non-criminal, purely private conduct constituted a basis for discipline under Rule 8.4(d), as follows:

> "Only when such purely private conduct is criminal or so egregious as to make the harm, or potential harm, flowing from it patent will that conduct be considered as prejudicing, or being prejudicial to, the administration of justice."

The undisputed facts in this case indicate that Williams, an attorney with over 25 years of experience, never complained about the terms of the $250,000 loan she made to the respondent. In fact, it was not until March of 2005, more than a

---

"[Bar Counsel]: Did you [Mr. Shoup] go to the Courthouse in March of 2004 with the promissory note?
"[Respondent]: Yes.
"[Bar Counsel]: And why did you do that?
"[Respondent]: Because they asked in that letter for a deed of— potentionally (sic), any deed of trust. So what I did was go there to try to comply with that wish, which was the first time I heard of it. That's when they told me you can't record a promissory note. And I apologize for my ignorance in that part of the law.
"[Bar Counsel]: All right. But you didn't try to record the promissory note in June of 2003? Correct.
"[Respondent]: No. And I was never asked to."
"[Bar Counsel]: And you never went, July, August, September, October, or any time before March to record the promissory note?
"[Respondent]: No. And I was never asked to." (Transcript 7/11/2007 at 204–05).

year and a half after making the $250,000 loan to the respondent that Williams demanded payment of the loan. In her deposition testimony, Williams states that she had consumed alcohol on the day she loaned the $250,000 to the respondent. That deposition testimony does not indicate, however, to what extent she might have been, if at .all, inebriated. In the absence of particular evidence, more particularly deposition testimony or other evidence specifically addressing the issue of Williams' capacity to have acted as she did, we will not assume that Williams' alcohol usage that day inhibited her mental faculties or gave the respondent an opportunity improperly to coerce Williams into lending him such a substantial amount of money. As Judge Harris found, and we agree, "it is apparent [that] this loan was one between 'boyfriend and girlfriend' and not a commercial transaction between an attorney and his client." Furthermore, the petitioner has failed to show by clear and convincing evidence that the respondent's conduct was so criminal or egregious that the harm to Williams was patent. As Judge Harris found, "Williams was not financially harmed by the loan arrangement, as she [Williams] was returned the full loan amount plus $50,000." Judge Harris even characterized the additional $50,000 demanded by Williams, and paid by the respondent, as "excessive." Even more telling, Williams never filed any disciplinary complaint against the respondent. Indeed, it was Williams' attorneys that took it upon themselves to contact Bar Counsel.

The petitioner also argues that the respondent acted dishonestly and, contrary to the hearing judge's conclusion, violated MRPC 8.4(c) by not making monthly interest payments on the promissory note he executed in favor of Williams. The petitioner goes on to assert that, not only did the respondent fail to make the monthly interest payments, but he deceived Williams by placing entries in the accounting that he provided to her, showing that $521 interest payments were made monthly from July 2003 to March 2004, when, in actuality, as the respondent's bank records revealed, those monthly interest payments had not, in fact, been made. The petitioner contends that Williams was harmed by the respondent's de-

ceptive conduct because the terms of the note entitled her to a $50 late fee when the respondent failed to pay the monthly interest payment timely.

The respondent conceded at the evidentiary hearing that, for the identified months, the $521 monthly interest payment was not timely made to the respondent:

"[Counsel]: Isn't [it] a fact that it was agreed that you would pay the monthly interest payments into your escrow account and use those monies to pay Barbara Williams' bills? [Respondent]: We never talked about the specific $521. She said whatever money is due me, she knew it was two and a half percent, it was not done, which was our mistake, which I have always said. And I've said it to Bar counsel at least on four other occasions. And when we saw the mistake we corrected it by putting that money in the escrow account, which is where it should have been." Tr. 7/11/07 at 197–98.

The facts, as found by Judge Harris, are consistent with the respondent's version of events. They indicate that, in January of 2004, when the respondent discovered that the $521 monthly interest payments had not been made on the loan, the respondent immediately placed the past due interest payments in Williams' escrow account. The respondent vehemently denied ever intending to deceive Williams by listing the $521 as monthly interest payments that were made between July of 2003 and January of 2004. The respondent explained at the evidentiary hearing that the accounting given to Williams in March of 2004, which listed monthly interest payments of $521, was merely indicating that Williams was owed $521 for that month, not that the $521 was actually paid to her that month:

"[Counsel]: And the accounting that you gave to Barbara Williams, which is a part of section five, page eight, lists $521 each month beginning July 14, 2003? Isn't that correct?

"[Respondent]: Again, Counsel we have gone over this, and I'm not upset at all, we've gone over this four times. I said

that was a listing of credits. We've talked about the word deposit and you said that was on that format. It was what money was owed to her. When we did an accounting Louis to Jeffries and we wanted to show everything that should, in our best estimate, money that was owed to her. It did not say—and I said in this Court of law under oath, once again, that we did not make those payments on that date and the word deposit was on that particular ledger form. We've talked about this several times. You and I.

\* \* \*

"[Counsel]: This is what counts. The fact that you put it down there, $521 each month, on the list that you sent Barbara Williams, you did that because you wanted her to think that you were paying $521 a month into your escrow account for the interest? Correct?

"[Respondent]: Absolutely not. She was credited that and it was a total amount that she was due when we made the accounting. I was not trying to deceive anyone to say each one of those months is when we made it. That was not my intent, not my purpose then, now or forever." Tr. 7/11/07 at 198–99.

██ The hearing judge was in the best position to assess the respondent's credibility, and, in light of this unique position, this Court will give significant deference to his interpretation of the evidence. *Attorney Grievance Comm'n v. Kimmel*, 405 Md. 647, 667, 955 A.2d 269, 281 (2008); *Attorney Grievance Comm'n v. Pak*, 400 Md. 567, 595, 929 A.2d 546, 562–63 (2007). In this case, the hearing judge found that the respondent "rendered a full accounting" of all the monies owed to Williams. In light of this finding, the hearing judge apparently believed the respondent's testimony that the entries of $521 in monthly interest payments were to indicate that that was the amount Williams was owed, not the amount that the respondent actually paid Williams at the time. The only evidence that the petitioner has presented to us that the respondent violated MRPC 8.4(c) by his entry of the $521 monthly interest payments was already heard and evaluated

by the hearing judge. As the petitioner has not persuaded us that the hearing judge was clearly erroneous in not finding the respondent's accounting of the monthly interest payments owed to Williams to be dishonest or fraudulent, we overrule the petitioner's exceptions on the hearing judge's conclusions regarding MRPC 8.4(c) and (d).

### Maryland Code § 10–306 of the Business Occupations and Professions Article

The petitioner's next exception is that Judge Harris erred in concluding that the respondent did not violate Maryland Code § 10–306 of the Business Occupations and Professions Article. That section provides that "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." Maryland Code § 10–307 [26] goes on to provide that a lawyer will be subject to disciplinary proceedings only when the violation of § 10–306 is willful. In *Attorney Grievance Commission v. Glenn*, 341 Md. 448, 482, 671 A.2d 463, 480 (1996), we noted that the "willfulness" requirement in § 10–306 can be satisfied on a showing that an attorney acted with a "general intent" to violate the statute. Here, Judge Harris found, without further elaboration, that the petitioner failed to show that the discrepancies in the respondent's client trust accounts were willful. Notwithstanding the brevity with which Judge Harris rendered this finding, he was uniquely positioned to assess the credibility of the witnesses at the evidentiary hearing. Maryland Rule 16–759(b)(2)(B); *Attorney Grievance Comm'n v. Ugwuonye*, 405 Md. 351, 367, 952 A.2d 226, 235–36 (2008) (citing *Attorney Grievance Comm'n v. Zdravkovich*, 375 Md. 110, 126, 825 A.2d 418, 427 (2003)). In his written findings,

---

**26.** Maryland Code (2004 Repl. Vol., 2008 Supp.) § 10–307 of the Business Occupations and Professions Article reads:

"A lawyer who willfully violates any provision of this Part I of this subtitle, except for the requirement that a lawyer deposit trust moneys in an attorney trust account for charitable purposes under § 10–303 of this subtitle, is subject to disciplinary proceedings as the Maryland Rules provide."

Judge Harris described the bookkeeping system that the respondent had in place before this disciplinary action commenced as "sloppy." Findings of Fact and Conclusions of Law at 6. The hearing judge went on to explain that, in his opinion, these bookkeeping errors and inadvertent deposits into the firm's operating account, as opposed to the client's escrow account, were not done for any nefarious purpose. Findings of Fact and Conclusions of Law at 6. The hearing judge's description of the respondent's mishandling of the trust accounts at issue here indicates to us that his conduct was negligent and did not amount to the willful act required to trigger disciplinary proceedings under § 10–306. Furthermore, the petitioner has not directed us to any evidence that would suggest that the hearing judge's conclusion was clearly erroneous. Therefore, we overrule the petitioner's exception.

### Maryland Rule 16–609

Maryland Rule 16–609 prohibits an attorney or law firm from, among other things, using funds in an attorney trust account for any unauthorized purpose or drawing checks or other financial instruments on the attorney trust account that are made payable to cash. Judge Harris found that the respondent used funds in his attorney trust account for an unauthorized purpose by inadvertently depositing checks into the firm's operating account when they should have gone into the firm's escrow account. Findings of Fact and Conclusions of Law at 16. In light of these "innocent clerical errors" by the respondent, Judge Harris concluded that he was compelled to find that the respondent committed a "technical violation of Rule 16–609." The respondent does not except to Judge Harris's conclusion. To the contrary, he "accepts full responsibility" for these innocent clerical errors that resulted in his violation of Maryland Rule 16–609. The only task remaining for us is to determine the proper sanction for the violation found.

### Sanction

The purpose of attorney disciplinary proceedings is to protect the public and the integrity of the legal profes-

sion, not to punish the individual offender. *Attorney Grievance Comm'n v. Ugwuonye*, 405 Md. 351, 373, 952 A.2d 226, 238–39 (2008); *Attorney Grievance Comm'n v. Adams*, 349 Md. 86, 98, 706 A.2d 1080, 1086 (1998). The severity of the sanction imposed by this Court will turn on the facts and circumstances of each case, taking into account any aggravating or mitigating circumstances. *Attorney Grievance Comm'n v. Adams*, 349 Md. 86, 98, 706 A.2d 1080, 1086 (1998) (citing *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 484, 671 A.2d 463, 480 (1996)). Indeed, the public is best protected when the sanctions that we impose correspond to the nature and gravity of the violations committed, taking into account the intent with which the lawyer committed them. *Attorney Grievance Comm'n v. Awuah*, 346 Md. 420, 435, 697 A.2d 446, 454 (1997).

■■■■ In this case, the hearing judge determined that the respondent's violation of Maryland Rule 16–609 resulted from negligent, rather than intentional, conduct. The facts indicate that the respondent's firm, at the time he volunteered to handle Williams' financial obligations, did not have adequate financial controls in place to ensure that checks intended for the respondent's escrow account would not be inadvertently placed into his operating account. Since Bar Counsel began investigating this matter, the respondent has been open and honest about his mistakes in handling Williams' checks. It is not lost on us that the respondent has made every effort to cooperate with Bar Counsel and to compensate Williams, perhaps above and beyond what she was due. The respondent has been a member of the Maryland Bar for over 32 years, and, other than this disciplinary proceeding, he has never had a single disciplinary complaint brought against him. We agree with the hearing judge that the respondent's violation of Maryland Rule 16–609 was unintentional and is unlikely to occur again.

The petitioner recommends that this Court disbar the respondent for violating Maryland Rule 16–609. The petitioner argues that this sanction is warranted because the "[m]isappropriation of entrusted funds is an act infested with deceit

and dishonesty." Petitioner's Exceptions and Recommendation of Sanction at 36. The respondent urges that the Court issue a public reprimand, noting his lack of a prior disciplinary history and the technical nature of the one violation he was found to have committed.

To be sure, the misappropriation of funds is a serious offense, and, indeed, intentional and willful misappropriation, in the absence of extenuating circumstances ordinarily will result in disbarment. *Attorney Grievance Comm'n v. Butler,* 395 Md. 1, 909 A.2d 226 (2006); *Attorney Grievance Comm'n v. Ellison,* 384 Md. 688, 867 A.2d 259 (2005); *Attorney Grievance Comm'n v. Daskalopoulos,* 383 Md. 375, 859 A.2d 653 (2004). Accordingly, the intent with which the respondent violated Maryland Rule 16–609 is particularly relevant to our determination of the appropriate sanction in this case. *Attorney Grievance Comm'n v. Post,* 379 Md. 60, 73, 839 A.2d 718, 726 (2003); *Attorney Grievance Comm'n v. Tomaino,* 362 Md. 483, 498, 765 A.2d 653, 661 (2001) (quoting *Attorney Grievance Comm'n v. Sheridan,* 357 Md. 1, 29, 741 A.2d 1143, 1158 (1999) (explaining that "the state of mind of the attorney at the time of the violation 'is important in the context of mitigation.' "). As we have seen, the hearing judge's findings are that that the respondent's violation of Maryland Rule 16–609 was unintentional and an innocent clerical error. We have determined that those findings are supported by the record and, therefore, not clearly erroneous. Thus, we are satisfied that the appropriate sanction in this case is a public reprimand.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JONATHAN H. SHOUP.*

BATTAGLIA, Judge, dissenting.

I dissent because I believe that the hearing judge's finding that there was no attorney-client relationship between Mr.

Shoup and Ms. Williams is clearly erroneous. Because such an attorney-client relationship did exist, I believe that Mr. Shoup not only violated Maryland Rules of Professional Conduct 1.1 (competency), 1.8 (entering into business relationship with a client) and 1.15 (safekeeping client property), and Maryland Rule 16–609 (prohibited transactions), but also Maryland Rule of Professional Conduct 8.4(c) (misconduct "involving dishonesty, fraud, deceit or misrepresentation"), and to protect the public from such conduct in the future, I would indefinitely suspend.